# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-04-00019-CR

**Stephen Michaelwicz, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 299TH JUDICIAL DISTRICT
### NO. 002250, HONORABLE JON N. WISSER, JUDGE PRESIDING

## O P I N I O N

Appellant Stephen Michaelwicz appeals his conviction for murder. Tex. Pen. Code Ann. § 19.03 (West 2005).[1] The jury found appellant guilty and assessed his punishment at ninety-nine years' imprisonment. Notice of appeal was given.

### Points of Error

Appellant advances seven points of error. First, appellant contends that the trial court erred in denying appellant's amended motion to dismiss the indictment for pre-indictment delay. Second, appellant urges that the "State committed reversible error" in failing to furnish the trial court with the offense report and "DNA lab reports from another murder case for an in camera 'hearing.'" Third and fourth, appellant complains that the trial court erred in prohibiting appellant from

---

[1] The current code is cited for convenience.

presenting evidence that the perpetrator of the offense "might have been" Michael Smith or Gary Gaston. Fifth and sixth, appellant asserts that the trial court erred in failing to grant mistrials at the punishment phase of the trial (1) when the State elicited from David Presley that appellant used drugs after the State had been explicity instructed not to do so, and (2) when the deceased's father testified that he had placed the deceased's mother in a mental hospital during the trial when the parties had agreed the State would not adduce such evidence before the jury. Seventh, appellant claims that the trial court erred in failing to instruct the jury at the punishment phase of the trial that no adverse inferences could be drawn from appellant's failure to testify at that stage of the trial. We will affirm the conviction.

**Background**

Appellant does not challenge the legal or factual sufficiency of the evidence to sustain the conviction. A discussion of the facts will place the points of error in proper perspective.

In 1988, Stephanie Walrath and the deceased, Debra Guess, lived at 8510 Riddington Drive in Austin. On Saturday, February 20, 1988, Walrath drove Guess to New West, a country western club. She described Guess as being in a good mood. Guess had a "new outfit" she wanted to show off, and wanted to see if Gary Gaston was at the club. Walrath explained that Guess had dated Gaston "off and on." Guess entered the club and returned to Walrath's vehicle. She told Walrath that she did not find Gaston but she was going to stay at the club and have a good time. Walrath recalled that Guess had consumed two or three beers before entering the club. Walrath related that she went to her boyfriend's apartment where she spent the night.

The next morning, Sunday, February 21, 1988, Walrath returned to her home about 10:30 a.m. She found Guess lying on the living room floor, dead. Guess, wearing a pink house dress, had one of Walrath's scarfs around her neck and her throat had been cut.

Austin Police Officer Fermin Delatorre was on patrol that morning and was the first officer on the scene. The EMS and the fire department were already at the address. Delatorre observed Guess's body, the gash across the neck, the blood and the scarf. Officer Danny Campos was dispatched to the scene. His investigation showed no forced entry of the house. Sergeant Detective Bruce Boardman arrived on the scene about 11:15 a.m. He described the blood around Guess's head as fresh. Boardman found a bone handled pocket knife under Guess's bed. From his investigation, he concluded the violence began in the hallway and escalated to the living room.

Dr. Robert Bayardo, Travis County Medical Examiner, performed the autopsy on the same day. He testified that the cause of death was asphyxia due to manual and ligature strangulation, along with the wound to Guess's neck. The wound was one-fourth of an inch in width, and had penetrated deeply on the right side down to the spine, severing the carotoid artery and partially severing the jugular vein. Dr. Bayardo testified that Guess was still alive when her throat was cut because her heart continued to pump blood. Based on the liver temperature of 96 degrees, the absence of rigor mortis, and the degree of liver mortis, the medical examiner stated that Guess died between 9 and 9:30 a.m. on February 21, 1988. The doctor explained that assailants often cut themselves when cutting victims.

Eighteen-year-old Michael Smith was washing the exterior windows of the house where he lived on February 21, 1988, between 9 and 10 a.m. He lived there with his father, Herman

Rosales and Rosales's wife, Ann Walrath, sister of Stephanie. The house was across the street from the house where Guess lived and her body was found.

Smith testified that he observed a black Mercury Cougar in the driveway of Guess's house—a car he had never seen before. A little later Smith saw a man, whom he identified as appellant, exit Guess's house carrying two white trash bags with something red inside. Appellant placed the bags in the Cougar and returned to the house. Smith described appellant as having long curly hair and a mustache, and wearing jeans, a pink or red shirt, cowboy boots and a straw hat. About a minute later, appellant emerged again from the house, got into the Cougar and drove off at about 10 a.m. Approximately thirty minutes later, Stephanie Walrath came to the Rosales home to report that she had found Guess dead.

Herman Rosales also observed the black Cougar in the driveway at the Guess house on the morning of February 21, 1988. Rosales was in his living room with a large window and a good view of the driveway. He stated that there was no possibility that anyone could have driven up between the time he saw the Cougar and the time Guess was found dead. Ann Walrath testified that she first noticed the black Cougar in the driveway about 4:15 a.m. on February 21, 1988, when she was nursing her baby, and then again about 9:30 a.m.

Police investigation led to the black Mercury Cougar and its owner, Chuck Northam. Northam testified that in 1988 he had been a close friend to appellant. On Saturday, February 20, 1988, he and appellant decided to drive from Temple to Austin to party, drink alcohol, dance, and pick up girls. About 9:30 or 10 p.m., they arrived in Austin in Northam's 1987 black Mercury Cougar and went to the New West Club. They were drinking beer at the time. Northam stated that

4

he met a girl, Phyliss Lewis, at the club and learned she worked for the same company that he did. He spent most of the evening dancing and talking with Lewis. The New West Club closed at 2 a.m. Sunday morning. Appellant suggested that they go to the Dallas Nightclub. Northam told appellant to drive the Cougar and he would ride with Lewis in her car. At the Dallas Nightclub, Northam saw appellant was with a girl. When the club closed at 4 a.m., appellant told Northam that he was going to a motel with the girl. Northam, who planned to spend the night with Lewis, let appellant borrow his car. Lewis gave her telephone number to appellant so he could contact Northam about their return trip to Temple. Appellant agreed not to call Northam too early in the morning.

Northam testified that appellant called him at 12:30 p.m. on February 21, 1988, and informed Northam that he (appellant) had already returned to Temple in Northam's car. Northam thought this was strange. Lewis drove Northam to Temple. On Monday, February 22, 1988, Lewis called Northam and informed him that there had been a murder in Austin and his car was involved. The police contacted Northam and interviewed him. Lewis generally corroborated Northam's testimony.

Paul White's testimony placed Guess at the New West Club on February 20, 1988. He had seen her there on prior occasions. On the night in question, she was drinking and "seemed out of it." White saw Guess flirting with a "cowboy" and they danced sexually. White tried to get Guess to go home but she said that she was going to the Dallas Nightclub with the "cowboy." Keith Couch, a security guard at the Dallas Nightclub, related that Guess was in the club between 2 and 4 a.m. on February 21, 1988, with a man with a cowboy hat and mustache.

Appellant's fingerprints were found in the Guess house on a bathroom door and a knickknack. A mixture of DNA was found on the door post of the Guess house and on the driver's door of the Mercury from which mixture appellant and Guess could not be excluded as contributors.

Appellant testified in his own behalf. Appellant acknowledged that he and Northam drove to the New West Club in Austin from Temple, and that at the club Guess hollored "Hey, cowboy" to him twice and motioned to him. He introduced himself. At closing time, he asked Guess to go with him to the Dallas Nightclub. The two drove there in Northam's car. When the Dallas Nightclub closed about 4 a.m., appellant said that Northam left with Phyliss Lewis who gave appellant her telephone number. Northam told him not to call that number before noon. Appellant left the club with Guess in Northam's black Mercury Cougar. Guess wanted to go to a motel, but appellant did not have enough money for a motel. Guess explained that they could not go to her home if her roommate was there. They drove to Guess's home. The roommate's car was not there so Guess invited appellant into the house.

Appellant related that he took the ice chest with beer from Northam's car and took it into the house. Appellant then drank two more beers. Guess placed a comforter on the living room floor and invited him to lie down with her. Appellant did and they kissed and fondled each other. They did not have sexual intercourse. Appellant stated that after he explained his performance problems to Guess she became quiet for several minutes and then began talking about visiting her parents in Amarillo. According to appellant, they then fell asleep.

Appellant testified that when he woke up he wandered into the bedroom while Guess was still asleep in the living room. He sat on Guess's bed and noticed his fingernails were dirty. He

6

began cleaning them with his pocketknife. In cleaning off the blade of the knife, appellant said that he cut his left index finger. He ran cold water over the cut in the bathroom. Guess awakened about this time and brought appellant a small plastic bag of ice to put on his finger. Appellant then took the ice chest to Northam's car. He then returned to the house and told Guess goodbye. Appellant testified he left a little after 9 a.m. Guess was alive at the time.

At the punishment stage of the trial, appellant offered the testimony of family and friends that in the fifteen years between the time of the offense and the trial, appellant had no criminal record and had led an exemplary life. He had married, had two children, worked successfully in the construction business, and had been a leader in community activities such as his church, Boy Scouts and family based organizations. Other defense evidence showed that appellant was a person of utmost character and not a person of violence. Still other testimony showed appellant had heart problems and his wife suffered from multiple sclerosis. Appellant acknowledges that the instant offense was a "horribly brutal offense" but complains that in view of the foregoing evidence the jury nevertheless assessed punishment at 99 years. Appellant urges that the penalty assessed resulted from the errors raised on appeal.

**Pre-indictment Delay**

In his first point of error, appellant claims that after he showed that his Fifth Amendment rights to due process were violated, the trial court erred in denying his amended motion to dismiss the second indictment for pre-indictment delay.

The instant offense occurred on February 21, 1988. Appellant was indicted in 1988 for the murder of Debra Guess. The indictment was dismissed on May 1, 1989. Appellant was

reindicted for the same offense on April 14, 2000. The trial did not take place until September 2003. The time period of which appellant complains is from the time of the dismissal of the first indictment until the presentation of the second indictment, a period of almost eleven years.

The applicable statute of limitations is the primary assurance against bringing unduly stale criminal charges. *Ibarra v. State*, 11 S.W.3d 189, 193 (Tex. Crim. App. 1999) (citing *United States v. Marion*, 404 U.S. 307 (1971). There is, however, no Texas statute of limitations for the offense of murder. *See* Tex. Code Crim. Proc. Ann. art. 12.01(A)(1) (West 2005). A defendant's rights with respect to events occurring prior to indictment are not fully defined by a statute of limitations. The due process clause of the Fifth Amendment to the United States Constitution has a limited role to play in protecting against oppressive delay. *United States v. Lovasco*, 431 U.S. 783, 789 (1977); *Marion*, 404 U.S. at 325.

A defendant may be entitled to relief for pre-indictment delay under the due process clause where he can show that the delay (1) caused substantial prejudice to his right to a fair trial, and (2) was an intentional device used to gain a tactical advantage over the defendant. *Ibarra*, 11 S.W.3d at 193; *Spence v. State*, 795 S.W.2d 743, 746 (Tex. Crim. App. 1990). The Fifth Circuit Court of Appeals has extended the second prong of the foregoing test to include "other impermissible bad faith purposes" without defining the phrase. *United States v. Crouch*, 84 F.3d 1497, 1514 (5th Cir. 1996).

Applying the two-pronged test, we observe first that appellant claims that as a result of the delay he lost "a fact witness at the time of death." This witness is not named. The time of the witness's passing was not shown nor was there an accounting of the witness's purported testimony.

8

"A fact witness at time of death" is incongruous with the statement of facts including appellant's trial testimony. Next, under the first prong of the test, appellant points out that early on a videotape was jointly made by the district attorney and appellant's former counsel of three witnesses, all of whom testified at trial. Appellant claims that the videotape was lost. The responsibility for the loss of the tape was never established, and appellant does not claim that he was harmed by being deprived of possible impeachment evidence. In order to prevail on the first prong of the test, appellant must show "actual prejudice" as opposed to "potential prejudice." *See Crouch*, 84 F.3d at 1515. This appellant has not done so.

As to the second prong of the test, Ashton Cumberbatch, a prosecutor in the case, testified at the hearing on the motion to dismiss that the first indictment was dismissed prior to jury selection on May 1, 1989, primarily to ensure the State an opportunity to further investigate the case. Cumberbatch testified that he was told that further scientific testing of the evidence by DNA analysis would be helpful and that at the time DNA science was beginning to evolve. Cumberbatch left the district attorney's office in July 1989.

Austin Police Detective Bruce Boardman had arrested appellant and investigated the case. He testified that he believed that the case was ready for trial in May 1989 and was not pleased with the dismissal order. He was told that additional witnesses would be called before a grand jury. He never heard that such action was undertaken. Later, Boardman was informed that more scientific testing needed to be done. He knew that certain items had been sent to the Department of Public Safety (DPS) Laboratory. Boardman revealed that he no longer investigated the case after May 1, 1989. He was not the case agent after 1992.

9

Irene Rios, supervisor of the DNA unit of the DPS laboratory, testified about the advancement of DNA testing in the 1980 's and 1990's. She explained that in 1988 very few labs in the United States did DNA testing using the RFLP technique and then only when a large amount of matter was available for testing. The DPS lab did not begin using RFLP testing until 1994. Shortly thereafter, the DQA technique became available but neither test was discriminating towards mixtures of DNA material. Certain items in appellant's case had been sent to Dr. Ed Blake in California in 1990 for DQA testing. Rios explained that the STR technique became available at the DPS lab in September 1998, a much improved technique for determining DNA mixtures. Rios reported that no STR testing in the instant case was done from 1998 to 2000 because the case had been closed and there had been no new requests for testing from the detectives. In September 1998, there was a large number of cold cases backlogged at the lab for STR testing. Items in the instant case were submitted in December 1999 and the results reported to the district attorney's office in March 2000.

Austin Police Detective Manuel Fuentes testified how appellant's case was re-opened. In March 1997, Fuentes was working on the unsolved murder of Cerrell Belt when he received information that appellant might be involved in that case. He learned appellant had been earlier indicted for the Guess murder. Fuentes found the Guess case in the closed file section in the storage area of the Austin Police Department. Bodily fluids and appellant's DNA were found in the file. The items were submitted to the DPS to determine appellant's connection to the Belt case. The tests cleared appellant as a suspect in the Belt case. Fuentes also decided to reopen the Guess case. In March 2000, DNA testing further established appellant's involvement in the instant case.

10

In *Lovasce*, 431 U.S. at 795, the United States Supreme Court stated:

In our view, investigative delay is fundamentally unlike delay undertaken by the Government solely "to gain tactical advantage over the accused," precisely because investigative delay is not so one-sided. Rather than deviating from elementary standards of "fair play and decency," a prosecutor abides by them if he refuses to seek indictments until he is completely satisfied that he should prosecute and will be able promptly to establish guilt beyond a reasonable doubt. Penalizing prosecutors who defer action for these reasons would subordinate the goal of "orderly expedition" to that of "mere speed." This the Due Process Clause does not require. We therefore hold that to prosecute a defendant following investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time.

The foregoing is pertinent to the instant case. *See Ibarra*, 11 S.W.3d at 193-94. There is no requirement that police conduct a continuous investigation in a case to prevent a Fifth Amendment violation. *Id*. at 193.

Appellant has not adequately demonstrated that pre-indictment delay by the prosecution violated the Due Process Clause of the Fifth Amendment. No actual prejudice has been proven, and there is no showing that the prosecution was intentionally delayed to gain some tactical advantage over appellant. We conclude that reliance on the possibility of prejudice inherent in any extended delay is not enough. The trial court did not abuse its discretion in overruling the motion to dismiss for pre-indictment delay. Point of error one is overruled.

**A Failed In Camera Inspection**

In point of error two, appellant states:

The State committed reversible error when it failed to obey the trial judge's order to furnish the offense report and the DNA lab reports in the unsolved Cerelle

Belt case so that the trial court could conduct an in camera hearing to determine if there was any exculpatory or mitigating evidence contained therein.

At the outset, we make two observations. First, "[w]hether error has been adequately preserved for appellate consideration cannot be evaluated, of course, unless the claimed error is first formulated and identified. . . . Formulation of claims of error are best approached on the assumption that only the trial judge can commit error. Further, error can, as a general matter, be committed only when the trial judge refuses a request for action or takes action over objection." 43A George E. Dix & Robert O. Dawson, *Texas Practice: Criminal Practice and Procedure* § 42.11 (2d ed. 2001). Moreover, a prosecutor cannot err. *Id.*; *see also Chimney v. State*, 6 S.W.3d 681, 703 (Tex. App.—Waco 1999, pet. ref'd) (in improper jury argument situations, any error can only arise from trial court's actions—overruling an objection, denying an instruction to disregard, or denying mistrial).

Second, if the State can err as asserted by appellant, we do not find that the "error" was preserved for review by an objection or otherwise. *See* Tex. R. App. P. 33.1. After the "order" was granted, appellant did not object to the State's failure to act, request enforcement of the "order" by the trial court, or obtain an adverse ruling. No motion for continuance was filed. Appellant permitted the trial to conclude without requesting any further relief. Moreover, there is no showing that if the State had produced the requested items for an in camera inspection by the trial court, appellant would have been given access to items or be legally entitled to the same.

12

**In the Interest of Justice**

Nevertheless, appellant has cited *Brady v. Maryland*, 373 U.S. 83 (1963) (holding State has affirmative duty to disclose favorable and material evidence to defense) and *Thomas v. State*, 837 S.W.2d 106 (Tex. Crim App. 1992) (discussing in camera inspections), claiming that the State's failure to produce the requested items for an in camera inspection violated his right to due process and deprived him of a fair trial. In view of the nature of the offense, the penalty assessed, and the claim of a due process violation, we shall in the interest of justice examine the record to determine if appellant's contention has merit on another basis. We keep in mind that most of the items requested were from the file in the 1990 murder of Cerrell[2] Belt which is still unsolved.

A brief recitation of background material is essential to placing the contention in proper perspective. The instant offense occurred on February 21, 1988. Appellant was indicted for the offense in 1988, but this indictment was dismissed in 1989. Detective Manuel Fuentes testified that in 1997 he was working on the Belt case when he received a tip from a Texas Ranger that a "Steven Macovich" might be involved. Belt's father had reported an anonymous telephone call saying that the caller had overheard "Macovich" in a Temple bar say that he had murdered "a girl from Lampasas." The report later proved to be false. It, however, led Fuentes to the instant case—a closed file in the warehouse basement of the Austin Police Department. Bodily fluids and DNA evidence in the file led to the reopening of the instant case. A comparison of DNA and fingerprint

---

[2] The parties have also used the spelling "Cerelle" Belt. Detective Manuel Fuentes, who investigated the Belt case, spelled the name for the record as "Cerrell."

13

evidence eliminated appellant as a suspect in the Belt murder case. Subsequently, appellant was reindicted on this case in April 2000.

We will pretermit any lengthy discussions of the various motions for discovery and disclosure of exculpatory evidence, the orders granting the motions, the withdrawal of the order, the pretrial colloquies at the bench, the pretrial hearings, the taking of the issues under advisement, and the lack of rulings on other occasions.

On September 19, 2003, after the jury was selected, appellant again asked for a discovery ruling, but this time appellant narrowed his request to an in camera review of the "offense report" and "the lab tests, DNA results" from the Belt case. In response to the trial court's inquiry, the prosecutors stated that they had not reviewed the Belt case file for exculpatory evidence, but another assistant district attorney and Detective Fuentes had. The trial court then stated:

> Well, perhaps the Court should conduct an in camera review of whatever that is to see whether it sees anything that would be exculpatory or mitigating and then put a copy—a sealed copy in the record for this. So the Court will do that.

This is the "order" upon which appellant relies. Immediately after the trial court's statement, the prosecutor sought clarification in order to produce what the trial court wanted. The discussion centered solely on the "offense report." The trial court stated that it wanted a copy to review that would then be sealed and placed in the record. The prosecutor agreed to have a copy of the "offense report" for the trial court by the following Monday.

14

The trial concluded without further record reference to the items sought. There was no complaint addressed to the trial court about the State's failure to produce the "offense report" or other items.

In the motion for new trial, appellant alleged that the State failed to comply with the trial court's order and "failed to allow the trial court to review the investigative file in the Belt case" preventing appellant "from establishing a link between the unidentified hairs found on the victim in the instant case and the perpetrator of the 'Cerelle' Belt murder." Appellant complained that the State's failure violated the due process clauses of the federal and state constitutions.

A visiting judge heard and overruled the motion for new trial. It appears that thereafter the visiting judge in an ex parte proceeding ordered that the Belt offense report be sealed and made a part of this appellate record.

**Discovery, *Brady* and In Camera Inspections**

The instant case involves shades of the right to discovery, the *Brady* rule, and in camera inspections.

A defendant in a criminal case does not have a general right to discovery of evidence in the possession of the State. *See Scaggs v. State*, 18 S.W.3d 277, 294-95 (Tex. App.—Austin 2000, pet. ref'd); *Gowan v. State*, 927 S.W.2d 246, 249 (Tex. App.—Fort Worth 1996, pet. ref'd). Limited statutory discovery has been provided. *See* Tex. Code Crim. Proc. Ann. art. 39.14 (West 2005). The decision about what is discoverable under the statute has long been committed to the discretion of the trial court. *See Whitchurch v. State*, 650 S.W.2d 422, 425 (Tex. Crim. App. 1983).

15

And this was true at the time of appellant's trial.[3]  Appellant does not rely upon article 39.14 to support his contention.

In *Brady*, the Court stated:

> We now hold that the suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material to guilt or to punishment irrespective of the good faith or bad faith of the prosecutor.

373 U.S. at 87.

"As developed in two later decisions, *United States v. Agurs* [427 U.S. 97] in 1976 and *United States v. Bagley* [473 U.S. 667] in 1985, *Brady* creates what amounts to a federal constitutional right to certain minimal discovery."  42 George E. Dix & Robert O. Dawson, *Texas Practice: Criminal Practice and Procedure* § 22.21 (2d ed. 2001).[4]  And the Texas Court of Criminal Appeals has interpreted article I, section 19 of the Texas Constitution ('due course of law') to give an accused the same rights he enjoys under *Brady* and its progeny.  *See Ex parte Adams*, 768 S.W.2d 281, 293 (Tex. Crim. App. 1989).  Nevertheless, the United States Supreme Court has stated: "There is no general constitutional right to discovery in a criminal case and *Brady* did not create one."  *Weatherford v. Bursey*, 429 U.S. 545, 559 (1979); *see also Page v. State*, 7 S.W.3d 207, 207 (Tex. App.—Fort Worth 1999, pet. ref'd); 42 Dix § 22.25.

---

[3]  Article 39.14 was amended in 2005 to eliminate much of the trial court's discretion, "[s]hall order" has replaced "may order."  *See* Act of May 29, 2005, 79th Leg., R.S., ch. 1019, § 1, 2005 Tex. Gen. Laws effective June 18, 2005.  The amendment is not applicable to appellant's case.

[4]  Under *United States v. Agurs*, 427 U.S. 97 (1976), a request for *Brady* material is not required.

To invoke *Brady* and its progeny, the accused must present evidence that (1) the prosecution suppressed or withheld evidence; (2) the evidence would have been favorable to the accused; and (3) this evidence would have been material to the accused's defense. *Cruz v. State*, 838 S.W.2d 682, 686 (Tex. App.—Houston [14th Dist.] 1992, pet. ref'd) (citing *Moore v. Illinois*, 408 U.S. 786, 794-95 (1972)). "Favorable" evidence is any evidence that, if disclosed and used effectively, may make the difference between conviction and acquittal. *Little v. State*, 991 S.W.2d 864, 866 (Tex. Crim. App. 1999); *Thomas v. State*, 841 S.W.2d 399, 404 (Tex. Crim. App. 1992) (citing *United States v. Bagley*, 473 U.S. 667, 676 (1985)). It includes both exculpatory and impeachment evidence. *Little*, 991 S.W.2d at 866. Evidence that is exculpatory is evidence which tends to justify, excuse, or clear the defendant from alleged fault or guilt. *Thomas*, 841 S.W.2d at 404. Impeachment evidence is that evidence which is offered to dispute, disparage, deny, or contradict. *Id*. Evidence is "material" if there is a reasonable probability that had the evidence been disclosed to the defense the result of the proceeding would have been different. *See Bagley*, 473 U.S. at 682. A "reasonable probability" is a probability sufficient to undermine the confidence in the outcome of the trial. *Id*.; *see also Kyles v. Whitley*, 514 U.S. 434 (1995).

Under *Brady*, the defendant has the burden of showing that, in light of all the evidence, it is reasonably probable that the outcome of the trial would have been different had the prosecutor made a timely disclosure. *Hampton v. State*, 86 S.W.3d 603, 612 (Tex. Crim. App. 2002) (citing *Bagley*, 473 U.S. at 682).

17

## In Camera Inspections

As noted, the State has an affirmative and ongoing duty to disclose evidence favorable to an accused and material to his guilt or punishment under the due process clause of the Fourteenth Amendment. *Brady*, 373 U.S. at 87-88. This duty attaches with or without a request for the evidence. *Bagley*, 473 U.S. at 682. The prosecutor, when unsure of whether to disclose the evidence, should submit the evidence to the trial court for consideration. *Agurs*, 427 U.S. at 106; *Thomas v. State*, 841 S.W. 399, 407 (Tex. Crim. App. 1992). This is, in effect, an in camera inspection on behalf of the State.

In a typical case where the defendant makes no request or only a *general* request for *Brady* material, it is the prosecutor who decides which information, if any, must be disclosed. The prosecutor's decision on disclosure is final unless a defendant becomes aware that other exculpatory evidence is being withheld and brings it to the attention of the trial court. *Pennsylvania v. Ritchie*, 480 U.S. 39, 59 (1987).[5]

In some situations where a defendant has failed to receive anything less than full disclosure under the *Brady* rule, he has a due process right to have the trial court examine the requested evidence in camera and then order disclosure of any appropriate information. *See Thomas*, 837 S.W.2d at 113, which relied heavily upon *Ritchie*, 480 U.S. at 58 n.15. It appears that a

---

[5] In *Pennsylvania v. Ritchie*, 480 U.S. 39 (1987), the Supreme Court held that an accused sexual abuser of a child had a right under the due process clause of the Fourteenth Amendment to have privileged records of a child abuse agency turned over to the trial court for in-chambers review of material information. The court held that a judicial in camera inspection of privileged records strikes a constitutional balance between the defendant's and the State's competing interests. *Id*. at 58-61.

18

defendant must make a preliminary showing of a "reasonable" or "plausible" probability that the information at issue contains evidence to which he is entitled under the *Brady* rule. *See Ritchie*, 480 U.S. at 58 n.15; 42 Dix § 22.35; *cf. Page*, 7 S.W.3d at 215; *Commonwealth v. Two Juveniles*, 491 N.E.2d 234, 239 (1986) (requiring a showing of a legitimate need for the information).

*Thomas* detailed the procedure to be followed. 837 S.W.2d at 414.[6] It was this procedure appellant sought to invoke when his *Brady* request seemed to fail. Appellant did not make the required plausible showing but the trial court did indicate that it would conduct an in camera inspection, seal the offense report and place it in the record. "Even if a defendant does not have a right to *in camera* inspection under *Thomas*, a trial court has broad discretion to conduct an inspection anyway and order the material produced for it." 42 Dix at 22.35.

We turn now to the items appellant contends should have been reviewed by the trial court in camera.

### DNA Profiles

In his point of error, appellant states that he was entitled under *Brady* to "DNA lab reports" from the Belt case. Elsewhere in appellant's brief, reference is generally made to "DNA

---

[6] [The] information should be inspected by the trial court in camera. Neither the attorneys for the State nor defendant should be present. It will be the responsibility of the court to determine if the produced information contains *Brady* evidence. The court must, in its sound discretion, take steps to ensure that, to the extent possible, the information remains confidential. If the information is deemed material at the time it is inspected or at any future stage of the trial, it must be released to the defendant. . . . At the conclusion of trial, the information shall be sealed and made part of the record.

*Thomas v. State*, 841 S.W.2d 407, 414 (Tex. Crim. App. 1992).

profiles, reports, results or tests" without any further specification. It is clear from some trial colloquy, allegations in the new trial motion, and appellant's suggested remand procedure that what appellant wanted was the DNA profile from the semen found in the Belt case compared with the DNA profiles from two unidentified hairs found in the instant case. The State argues that without a comparison by an expert witness and the expert's testimony, the evidence had not yet come into existence, and thus was not shown to be favorable or material under Brady,[7] and was not "evidence" that had been suppressed.[8] Appellant was obviously seeking evidence to support his alternative perpetrator defensive theory. As noted, appellant had been cleared as a suspect in the Belt case, a case with some similarities to the instant case but also with more differences according to Detective Fuentes.

Normally, courts will not order the State to produce information under *Brady* based merely upon a defendant's speculation that the requested information contains exculpatory evidence. *Page v. State*, 7 S.W.3d 202, 206 (Tex. App.—Fort Worth 1999, pet. ref'd); *Gowan v. State*, 927 S.W.2d 246, 250 (Tex. App.—Fort Worth 1996, pet. ref'd) (refusing to make "leap of faith" necessary to assume police file on seven unrelated rapes would show that rape for which defendant was charged was committed by another assailant). "The mere possibility that an item of undisclosed information might have helped the defense or might have affected the outcome of the trial does not

---

[7] Nothing in this record shows that appellant was precluded from requesting that the DNA samples be submitted for analysis by his own expert. *See Scaggs v. State*, 18 S.W.3d 277, 296 (Tex. App.—Austin 2000, pet. ref'd).

[8] The State apparently had not determined that a comparison of DNA profiles was necessary to a proper investigation in either the Belt case or instant case.

establish 'materiality' in the constitutional *sense*." *Agurs*, 427 U.S. at 109; *see also Hampton v. State*, 86 S.W.3d at 612.

Usually a determination concerning the materiality prong of *Brady* involves balancing the strength of the exculpatory evidence against the evidence supporting the conviction. *Hampton*, 63 S.W.3d at 613 (citing *Bagley*, 473 U.S. at 683). The information appellant wanted disclosed had not yet come into existence and thus it was not shown to be material for *Brady* purposes. The evidence supporting appellant's conviction was overwhelming. The scale tilted. There was nothing to balance under the circumstances.[9]

Moreover, clarification by the trial court appeared to limit his intended in camera inspection to the "offense report" in the unrelated Belt case. Appellant has not demonstrated error in the State's failure to facilitate an in camera review of the DNA profiles in question.

### Offense Report

Next, we turn to the "offense report" in the Belt case of which appellant wanted the trial court to make an in camera review. The "offense report" was sealed and placed in the record by a visiting judge in an ex parte hearing after the motion for new trial was overruled. We have examined the "offense report" and find it to be a collection dated October 13, 1997, of a series of "incident reports" from 1990, 1992, 1994, and 1997. No later reports were included. The "offense report" reflects investigation into the unsolved Belt case, collection of evidence at the scene and

---

[9] An in camera review of the DNA profiles from each case as requested, without an analysis by an expert witness, would serve little purpose. Even if the trial judge was an expert in the DNA field, a judge cannot be a witness. *See* Tex. R. Evid. 605.

21

elsewhere, interviews with witnesses and suspects, and other normal investigative procedures. We find no mention of the instant case or of appellant even though he was investigated and cleared as a suspect in the Belt case. Thus, the indication is that not all the "incident reports" were included in the "offense report" now in the record. Nothing included in the Belt "offense report" in this record constitutes exculpatory or material evidence in the instant case so as to invoke *Brady*. The mere possibility that appellant may have found the name or names of other men or suspects to suggest as alternative perpetrators in the instant case which might have helped the defense or might have affected the outcome of the trial is not "materiality" under *Brady*. *See Hampton*, 63 S.W.3d at 612; *see also United States v. Kotex*, 174 F.3d 580, 583 (5th Cir. 1999). Appellant cannot rely upon speculation in this regard. *See Gowan*, 927 S.W.2d at 250.

Police arrest and offense reports are not generally subject to production. *Brem v. State*, 571 S.W.2d 314, 322 (Tex. Crim. App. 1975); *Holloway v. State*, 525 S.W.2d 165, 168 (Tex. Crim. App. 1975). The prosecution is not required to disclose its investigative work. *See Rector v. Johnson*, 120 F.3d 551, 558 (5th Cir. 1997). Although the State must disclose evidence under the *Brady* rule, it "need not disgorge every piece of evidence in its possession. *Id*. The State is under no duty to disclose neutral or inculpatory information to the defendant, *United States v. Johnson*, 872 F.2d 612, 619 (5th Cir. 1989), or share all useful information with the defendant. *United States v. Ruiz*, 536 U.S. 622, 629 (2002). The prosecution cannot be required to anticipate all possible defenses and provide the defendant with information to bolster those defenses. *See United State v. Runyan*, 290 F.3d 223, 245-46 (5th Cir. 2002).

22

The State has a compelling interest in law enforcement and in solving crimes. As the pretrial testimony demonstrated the prosecutors feared that the production of the Belt investigative file, including the "offense report," would reveal facts known only to the killer of Belt, preventing any future prosecution in that case. The State's interest would clearly outweigh the claimed interest of appellant in the Belt case under the circumstances here presented. We find no due process violation. Point of error two is overruled.

## Excluding Alternative Perpetrator Evidence

In his third and fourth points of error, appellant contends that the trial court erred in prohibiting the defense from presenting evidence to show that the perpetrator of the offense might have been Michael Smith or Gary Gaston. Appellant argues that each time he attempted to offer evidence to show that Smith or Gaston could have been alternate perpetrators, the trial court excluded the evidence on the basis of *Wiley v. State*, 74 S.W.3d 399 (Tex. Crim. App. 2002). Appellant asserts that the trial court's evidentiary rulings denied him the opportunity to present a meaningful defense. We review the trial court's rulings for an abuse of discretion. *Montgomery v. State*, 810 S.W.2d 372, 390-91 (Tex. Crim. App. 1991) (op. on reh'g); *Patterson v. State*, 96 S.W.3d 427, 434 (Tex. App.—Austin 2002, no pet.).

Through the Sixth and Fourteenth Amendments to the United States Constitution, persons accused of crimes are guaranteed a meaningful opportunity to present a complete defense. *Crane v. Kentucky*, 476 U.S. 683, 690 (1986); *California v. Trombetta*, 467 U.S. 479, 485 (1984).

> Although a defendant obviously has a right to attempt to establish his innocence by showing that someone else committed the crime, he still must show that his proffered

23

evidence regarding the alleged alternate perpetrator is sufficient on its own or in coordination with other evidence in the record to show a nexus between the crime charged and the alleged "alternate perpetrator."

*Wiley*, 74 S.W.3d at 406; *see also Patterson*, 96 S.W.3d at 434; *Matthews v. Price*, 83 F.3d 328, 332 (10th Cir. 1996) (noting, in federal habeas proceeding, that the State court had held that "a defendant may not present evidence that another was an alternate suspect of a crime without proof that the other person committed some act directly connecting him with the charged crime."); *State v. Woods*, 508 S.W.2d 297, 300 (Mo. App. 1974) ("evidence that another person had opportunity or motive for committing the crime for which the defendant is on trial is not admissible absent proof that the other person committed some act directly connecting him with the crime.").

It is not sufficient for a defendant merely to offer up unsupported speculation that another person may have done the crime. Such speculative blaming intensifies the grave risk of jury confusion, and it invites the jury to render its findings based on emotion or prejudice.

*United State v. McVeigh*, 153 F.3d 1166, 1191 (10th Cir. 1998); *see also Wiley*, 74 S.W.3d at 407 n.21.

### Facts Concerning Michael Smith

As observed earlier, Smith was a crucial witness for the State. At the time of the offense in February 1988, the eighteen-year-old Smith lived with his father and stepmother, across the street from where the victim lived. He had been there only a few weeks. On the morning in question, Smith was washing windows while his father observed. Smith testified that he saw appellant exit the victim's house about 10 a.m. and place two trash bags in the black Mercury Cougar

24

automobile parked in the victim's driveway, return to the house, and then shortly thereafter return to the car and drive off.

Some fifteen years later, and several weeks prior to appellant's trial in September 2003, appellant's trial counsel learned that Smith's parental rights to a child had been terminated on August 31, 2003, following a jury trial. The trial court quashed a subpoena issued for Ann Foreman, assistant district attorney, who had represented the Child Protective Services in the termination case. The trial court did conduct an in camera review of the district attorney's file in the termination case but refused to look for any exculpatory or mitigating evidence. The trial court ordered that the State keep the file and at a later date the court would rule on the defense request to seal the file and make it a part of the appellate record.

On October 1, 2003, during trial, appellant filed a "motion to introduce evidence concerning Michael Smith's propensity for violence and other specific acts," along with a brief and a copy of the "transcript" from the termination proceedings. Appellant proffered to the trial court that the evidence showed that (1) Smith had committed perjury at the termination trial, (2) Smith was on felony probation for driving while intoxicated at the time of the instant trial (this fact was elicited before the instant jury when Smith testified), and (3) one of the allegations in the termination proceeding was that Smith had sexually abused his own child. The trial court ruled that appellant could not introduce this evidence to show that Smith might have been an alternate perpetrator of the murder.

Appellant perfected an informal bill of exception eliciting testimony from Neely Peterson, Smith's ex-wife, that Smith was not a trustworthy person. She related that she was dating

Smith in February 1988 and that they married in August 1988; that he later became violent with her, slapping her, giving her a black eye, and pushing her to the ground. On one occasion, she went to the hospital for sutures as a result of his violence. After the bill was perfected, the trial court permitted her to testify before the jury only that Smith was not a truthful person.

On October 7, 2003, appellant perfected another bill of exception by calling Ann Foreman to testify about what occurred at the termination proceedings. She related that the evidence showed Smith had committed domestic violence against his first wife, Neely, and that the jury terminated his parental rights to his daughter. Foreman testified that she had no opinion about Smith's "character for truth," but acknowledged that during the termination proceedings, she told the trial judge Smith was not being truthful on "any issue whatsoever." The trial court did not permit Foreman to testify before the jury in this murder trial.

The evidence appellant sought to offer concerning Smith was inadmissible. The evidence relating to Smith's misconduct particularly with family members in the fifteen year post-murder period was speculative at best to show that Smith was an alternate perpetrator of the murder. The testimony also would have presented a great threat of "confusion of issues." *Wiley*, 74 S.W.3d at 407. If admitted, the testimony would have forced the State to attempt to disprove that Smith's post-murder conduct rendered him the perpetrator of the crime charged, when there was no act directly connecting him with the offense charged. Appellant argues that Smith lived across the street from the murder scene and had an opportunity to have committed the offense. But without proof of an act directly connecting Smith with the offense charged, mere opportunity is insufficient. *Woods*, 508 S.W.2d at 300.

26

In light of the medical examiner's testimony that the victim died between 9 and 9:30 a.m. on the morning of February 21, 1988, and appellant's testimony that he and the victim were alone together at the victim's house until approximately 9 a.m. that morning, Smith's observations confirming appellant's departure about 10 a.m. while Smith was washing windows under the watchful eyes of his father and stepmother demonstrate no nexus between the crime charged and the alleged "alternate perpetrator." *See Wiley*, 74 S.W.3d at 406. Under the circumstances, the trial court did not abuse its discretion in excluding the evidence offered. Appellant was not deprived of his constitutional right to present a defense. Appellant has not briefed the admissibility of the evidence under Rules 401, 402, or 403 of the Texas Rules of Evidence. *See* Tex. Rules App. P. 39.1. The third point of error is overruled.

**Facts Concerning Gary Gaston**

Guess's roommate, Stephanie Walrath, who discovered the body upon her return to the house on the morning of February 21, 1988, testified that Gary Gaston had been dating Guess and that Guess and Gaston had spent the night together on Friday, February 19, 1988 at Gaston's apartment. Walrath testified that the next night (Saturday), she drove Guess to the New West Club because Guess wanted to show her new outfit to Gaston. Guess returned to Walrath's car and told Walrath that Gaston was not at the club, but that she was going to stay at the club. Walrath never saw Guess alive again.

Michael Smith saw a man leaving Guess's house about 10 a.m. on February 21, 1988 wearing western clothes, jeans, a red shirt, and wearing a white or tan straw cowboy hat. The man drove away in the black Mercury Cougar parked nearby. The police picked up Gaston at 11 a.m.

27

approximately thirty minutes after the discovery of Guess's body. He was shirtless, wearing jeans, and carrying a white straw cowboy hat. The place of arrest was described as "fifteen minutes away" from the murder scene.

There was evidence that when appellant was seen with Guess, appellant was wearing a black felt hat. Appellant admitted that he was the man who drove the black Cougar away from Guess's house. Smith later changed his testimony and said the man leaving the house could have been carrying a "regular" cowboy hat.

The DNA test results were admitted into evidence. Known hair samples of Gaston were compared with hair samples found at the murder scene. Gaston was excluded as a contributor. Gaston's DNA was compared to blood stains found and he was excluded as a contributor to any of that evidence.

Gaston testified for the State. He described Guess as a good friend and acknowledged that they had a sexual relationship. Gaston stated that he and Guess had spent the Friday night prior to the offense together at his apartment and that they had sexual relations. He stated that he spent the next night at his ex-wife's apartment. He did not leave there until about 10 a.m. on the morning of the offense. Nidia Hirom, Gaston's ex-wife, confirmed that he did not leave her apartment until 10 or 10:30 a.m. on February 21, 1988.

On cross-examination of Gaston, appellant sought permission to inquire about Gaston's violent nature with his ex-wife. The trial court denied the request citing *Wiley*. Appellant argued that he had a right to present a defense of an alternate perpetrator. Counsel argued that Gaston had a violent past, he was arrested thirty minutes after the body was discovered and only

28

fifteen minutes away from the murder scene, and he had a white straw cowboy hat like that reportedly seen by Smith. The trial court persisted in its ruling. Later, appellant's trial counsel made an offer of proof to the effect that if Gaston's ex-wife was allowed to testify, she would tell the jury that Gaston committed family violence on her " up and through 1987" and on occasions choked her as the victim had been choked. The trial court did not permit this evidence before the jury.

Still later, appellant's counsel made another offer of proof that if the ex-wife was allowed to testify, she would state that in 1987 she had a confrontation with Gaston about stealing money from his son's piggy bank to buy drugs. On that occasion, Gaston grabbed her by the throat, choked her, and shoved her against a wall. Here again, the trial court did not permit this evidence before the jury. Appellant contends that he was deprived of his constitutional right to present a defense of an alternate perpetrator. Under the circumstances, the trial court did not abuse its discretion in excluding the evidence. The proffered evidence regarding the alleged alternate perpetrator was not sufficient on its own or in combination with other evidence to show a nexus between the crime charged and the alleged "alternate perpetrator." *Wiley*, 74 S.W.3d at 406. Appellant was not deprived of his claimed constitutional right. Here again, appellant does not brief this point of error as relating to Rules 401, 402, and 403 of the Texas Rules of Evidence. *See* Tex. R. App. P. 38.1. The fourth point of error is overruled.

**Motion for Mistrial - Evidence of Drug Use**

In the fifth point of error, appellant asserts that the trial court erred in failing to grant a mistrial at the punishment stage of the trial when the prosecutor elicited testimony from David

29

Presley that appellant used drugs in 1977 and 1978. The State had been instructed by the trial court not to elicit such testimony.

In absence of the jury, David Presley testified that he and appellant were good friends. In 1987, they had "partied" together in several counties, using cocaine and ecstasy. There was also one incident with a prostitute. As a result of a violation of a discovery order and other legal reasons, the trial court ruled that Presley would not be permitted to give the same testimony before the jury. The prosecutor then stated that Presley would be called only as a character witness, and Presley would be instructed as to what testimony would be impermissible.

Before the jury, the record reflects Presley's direct examination:

> Q. Back in the time period specifically 1987 prior to the offense date of February 21st of 1988, did you have an opinion as to the defendant's character for being a law-abiding citizen?
>
> A. Yes.
>
> Q. And what was that opinion? Was he a law-abiding citizen?
>
> A. Not in respect to the drug use that we had.

The trial court immediately sustained appellant's objection and instructed the jury to disregard the answer, but denied appellant's motion for a mistrial.

The denial of a motion for mistrial is reviewed under an abuse of discretion standard. *Trevino v. State*, 991 S.W.2d 849, 851 (Tex. Crim. App. 1999); *Bryant v. State*, 25 S.W.3d 924, 926 (Tex. App.—Austin 2000, pet. ref'd). Ordinarily, a prompt instruction by the trial court to disregard will cure error associated with an improper question, answer, or argument. *Avalle v. State*, 13

30

S.W.3d 774, 783 (Tex. Crim. App. 2000). The jury is presumed to follow the trial court's instruction to disregard unless the comment is so prejudicial or extreme that the instruction was incapable of removing the harm; *Gardner v. State*, 730 S.W.2d 675, 696 (Tex. Crim. App. 1987); *Campos v. State*, 589 S.W.2d 424, 428 (Tex. Crim. App. 1979). Mistrials should be granted only when the error is "highly prejudicial and incurable." *Simpson v. State*, 119 S.W.3d 262, 272 (Tex. Crim. App. 2003).

The error here occurred after appellant had been found guilty. The error was one relating to punishment only. After the instruction to disregard, Presley did not repeat his testimony nor was there any other mention of drug use in the testimony or in the jury argument that followed. Appellant faults the State for its action earlier at the guilt-innocence stage of the trial in attempting to insinuate drug use. Two unobjected-to jury arguments at the first stage of the trial are called to our attention. We have carefully considered appellant's argument but conclude that the trial court did not abuse its discretion in denying the motion for a mistrial. Point of error five is overruled.

### Another Motion for a Mistrial - Victim's Mother in Mental Hospital

In the sixth point of error, appellant asserts that the trial court erred in denying the motion for a mistrial at the punishment stage of the trial when the victim's father testified that he had just put the victim's mother in a mental hospital. Appellant claims this testimony was elicited in violation of an agreement he had with the State.

In the absence of the jury, the trial court discussed with counsel the witnesses who would be called at the punishment stage of the trial. The State informed the court that the victim's

31

father was flying to Austin to testify, that he and the victim's mother had returned to Amarillo, and she had been placed in a mental hospital. Later, appellant's counsel told the court that he had heard rumors that the State would offer evidence that "this trial" was the reason the mother was in a mental institution. He asked that the court first hear this evidence in the absence of the jury.

One of prosecutors replied that the State would just have the victim's father explain that his wife was ill; that the trial had been traumatic for the victim's mother, but the State was not going "to blame the entire trial" for her mental illness; and that the State understood that the mother had had prior mental issues. The trial court then began to discuss other matters. This is the only evidence of an "agreement" in the record.

At the punishment hearing, Robert Guess testified that he and his wife lived in Amarillo and had traveled to Austin for the trial. The record then reflects on direct examination:

Q. And did you stay, you and Mrs. Guess - did you stay until late last week and then have to go back to Amarillo?

A. Yes, ma'am. We had to . . .

Q. And were the details of this trial too much for your wife?

A. Yes, ma'am, I think it got to her. Too much of a past from when you start from a little . . . a little girl and all of a sudden and then she'd grow up and everything and it's kind of got to her. In fact, I had to put her into a mental hospital.

Appellant's counsel objected stating that he thought there was an agreement on "this." The prosecutors acknowledged there was an agreement. The trial court sustained the objection and instructed the jury to disregard the witness's last statement, but denied the motion for mistrial.

After both sides closed at the punishment stage of the trial, appellant's counsel made what he labeled a "bystanders bill" that there had been an agreement with the State about Robert Guess's testimony about his wife. The bill or offer was essentially what was reflected by the earlier discussion. The trial court took no action on the matter thereafter. No jury argument touched on the issue.

As observed earlier, a prompt instruction to disregard will ordinarily cure any error associated with an improper question, answer, or argument. *Ovalle*, 13 S.W.3d at 783. Robert Guess's comment was not so prejudicial or extreme that the trial court's instruction was incapable of removing the harm. *Gardner*, 730 S.W.2d at 696; *see also Simpson*, 119 S.W.3d at 272.

Appellant urges that the State was responsible for the improper answer or comment. He relies upon *Stahl v. State*, 749 S.W.2d 826 (Tex. Crim. App. 1988). There, a murder conviction was reversed because of the prosecutor's actions. Knowing the emotional state of the witness, the prosecutor called the victim's mother to the witness stand to identify a photograph of her son in the morgue. Although cautioned by the trial court, the mother began to sob on the stand and yell at the defendant. Subsequently, the prosecutor took advantage of this emotional outburst before the jury in his jury argument. The court, in effect, concluded that the prosecutor had orchestrated the outburst. *Stahl* is to be distinguished on its facts and the law.

Appellant also cites *Ulmer v. State*, 292 S.W. 245, 246 (Tex. Crim. App. 1927). There in a rape case, a daughter of the defendant and a sister to the complaining witness testified for the State. The record reflected:

Q.   How long had you been living with your father at that time?

33

A. All my life except when he was in the penitentiary.

The trial court sustained the objection and instructed the jury to disregard the statement about the penitentiary. The opinion does not mention a motion for a mistrial. This issue was presented by a formal bill of exception, which was the method of presenting issues on appeal at the time. The appellate court combined this bill with another bill of exception before deciding to reverse the conviction. The other bill reflected that the same witness was shown to be the mother of a small child. When asked if she was married at the time, she replied, "No, sir; it was my father's baby."

The nature of the answers in *Ulmer* is far different from the nature of Robert Guess's statement in the instant case. Moreover, in *Ulmer* there was a unitary trial, not a bifurcated one. The issue of guilt had not been decided when the witness's answers were given in *Ulmer*.

We cannot say that the trial court abused its discretion in denying the motion for mistrial in the instant case after the jury instruction was given. Point of error six is overruled.

**The Failure to Instruct on Defendant's Failure to Testify**

In the seventh point of error, appellant contends that the trial court erred in failing to instruct the jury in its charge at the punishment stage of the trial that no adverse inferences could be drawn from his failure to testify.

Appellant testified at the guilt-innocence stage of the trial waiving his privilege against self- incrimination at that stage. He did not testify at the second stage of the trial. The trial court did not instruct the jury at this stage of the trial on appellant's right to remain silent without

34

any adverse inferences being drawn therefrom. There was no request from appellant for such an instruction nor was any objection to the charge made because of the omission of the instruction. Appellant did not seek in any way the employment of the cautionary or prophylactic instruction. Now on appeal appellant claims that the trial court erred in not *sua sponte* giving the instruction at the punishment stage of the trial. Appellant contends that the error can be reviewed under the constitutional harmless error analysis of *Chapman v. California*, 386 U.S. 18 (1967) and Rule 44.2(a) of the Texas Rules of Appellate Procedure or as "fundamental" error resulting in "egregious harm" under *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984 (op. on reh'g)) We do not agree. An appellate court's first duty in evaluating a jury charge issue is to determine whether error exists. *Middleton v. State*, 125 S.W.3d 450, 453 (Tex. Crim. App. 2003); *Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996). Before a harm analysis there must be error.

There are federal and state constitutional guarantees that an accused in a criminal case may not be compelled to give self-incriminating testimony. *See* U.S. Const. Amend. V, cl. 3; Tex. Const. art. I, § 10; *see also* Tex. Code Crim. Proc. Ann. arts. 1.05, 38.08 (West 2005). The Fifth Amendment command is applicable to the states through the Fourteenth Amendment to the United States Constitution. *Carter v. Kentucky*, 450 U.S. 288, 297; *see also Malloy v. Hogan*, 378 U.S. 1 (1964).

In *Carter*, the United States Supreme Court held that a defendant in a state criminal trial has the right under the privilege against self-incrimination protected by the Fifth and Fourteenth Amendments *upon request*, to have the trial court give the requested "no adverse inferences" instruction. The trial court has the constitutional obligation *upon proper request* to give the

instruction to minimize the danger that the jury will give evidentiary weight to a defendant's failure to testify. 450 U.S. at 305. The *Carter* opinion made clear that its holding depended upon a proper request by a defendant for the instruction. *See id*. at 300, 303, 305. Justices Stevens and Brennan concurred, expressly pointing out that the court's holding was actually limited to cases in which the defendant had requested a "no adverse inferences" instruction, and the question whether such an instruction should be given in any specific case should be answered by the defendant and his lawyer, not by the State. 450 U.S. at 307.

Other courts have followed *Carter,* holding that the trial court is only required to give a "no adverse inferences" instruction when proper request is made, and that failure to give an unrequested instruction is not error. *See*, *e.g.*, *United States v. Gomez-Olivas*, 887 F.2d 500, 501-02 (10th Cir. 1990); *Coleman v. Brown*, 802 F.2d 1227, 1234-35 (10th Cir. 1986); *Dutton v. State*, 674 F.2d 1134, 1139-40 (Okla. Crim. App. 1984). The *Carter* rule also applies to the punishment phase of a bifurcated trial. *See United States v. Flores*, 63 F.3d 1342, 1376 (5th Cir. 1995).

Texas cases are generally in accord with *Carter*. If a defendant properly requests or timely objects, he is entitled to a jury instruction that his failure to testify cannot be taken as a circumstance against him. *See*, *e.g.*, *Wilkens v. State*, 847 S.W.2d 547, 553 (Tex. Crim. App. 1992); *Brown v. State*, 617 S.W.2d 234, 238 (Tex. Crim. App. 1981).

The rule also applies to Texas bifurcated jury trials under article 37.07(2)(a). Tex. Code Crim. Proc. Ann. art. 37.07(2)(a) (West Supp. 2005);[10] *Wilkens*, 847 S.W.2d at 553; *Beathard*

---

[10] Our bifurcated trial procedure is limited to cases involving pleas of not guilty before a jury. *See* Tex. Code Crim. Proc. Ann. art. 37.07(2)(a) (West Supp. 2004-05); *Barfield v. State*, 63 S.W.2d 446, 449 (Tex. Crim. App. 2001); *Dunhart v. State*, 668 S.W.2d 384, 386 n.3 (Tex. Crim. App.

*v. State*, 767 S.W.2d 423, 432 (Tex. Crim. App. 1989); *Mose v. State*, 632 S.W.2d 344, 345 (Tex. Crim. App. 1982).

*Brumfield v. State*, 445 S.W.2d 732, 741 (Tex. Crim. App. 1969), earlier concluded that if article 37.07 could be interpreted as providing for two separate proceedings, it followed that a defendant's waiver of his privilege against self-incrimination by testifying at the guilt stage of the trial is limited to that particular stage. Thus, appellant retains his Fifth Amendment privilege at the punishment stage of the trial.[11]

In *Stewart v. State*, 666 S.W.2d 548 (Tex. App.—Dallas 1984, pet. ref'd), the court reversed the conviction because the trial court refused to give the requested instruction upon request. There the *Stewart* court wrote:

> Although appellant's testimony at the guilt-innocence stage may be considered by the jury in assessing punishment, *Brumfield*, 445 S.W.2d at 740, the protection against self-incrimination continues until all proceedings have terminated. Since appellant testified during guilt-innocence, the jury never received an instruction regarding appellant's right to remain silent; hence, they may have been more disposed than the *Brown* jurors to give evidentiary weight to appellant's unexplained silence during the punishment phase.

*Id*. at 549.

---

1984); *Baraldua v. State*, 481 S.W.2d 851, 852-53 (Tex. Crim. App. 1972). This limitation is not always carefully observed.

[11] *Brumfield v. State*, 445 S.W.2d 732 (Tex. Crim. App. 1969) was a plurality opinion. The holding was later embraced by the majority. *See Beathard v. State*, 767 S.W.2d 423 (Tex. Crim. App. 1989); *Nelson v. State*, 765 S.W.2d 401 (Tex. Crim. App. 1989); *Brown v. State*, 617 S.W.2d 234 (Tex. Crim. App. 1981).

*Brown*, 617 S.W.2d at 238, made clear in tracking *Carter* that a defendant is entitled to a "no adverse inferences" instruction only if he timely requests one. *See also Jannine v. State*, 789 S.W.2d 623, 628 (Tex. App.—Beaumont 1990, pet. ref'd). A trial court is under no obligation to give such instruction in the absence of a timely request or objection. *Anderson v. State*, 504 S.W.2d 507, 511 (Tex. Crim. App. 1974); *see also Gentech v. State*, 654 S.W.2d 768, 771 (Tex. App.—Houston [14th Dist.] 1983, no pet.).

Some courts have spoken in terms of waiver of the right to the cautionary instruction in the absence of a request or objection. *See Calderon v. State*, 950 S.W.2d 121, 132 (Tex. App.—El Paso 1997, no pet.); *Ulloa v. State*, 901 S.W.2d 507, 510 (Tex. App.—El Paso 1995, no pet.); *Castenada v. State*, 852 S.W.2d 291, 294-95 (Tex. App.—San Antonio 1993, no pet.). A waiver of a "right" is distinguished from a waiver of an "error." Until there is a timely request for the instruction the constitutional right to the instruction does not arise. Only if there is a timely request for the instruction and the trial court refuses the request does error occur.

Whether to request a "no adverse inferences" jury instruction is within the tactical discretion of the defense counsel. *Gomez-Olivas*, 887 F.2d at 502; *Henson v. State*, 734 S.W.2d 119, 120 (Tex. App.—Houston [1st Dist.] 1987, pet. ref'd). *Cf. Posey v. State*, 966 S.W.2d 57, 62-63 (Tex. Crim. App. 1998) (holding defensive issues not "applicable to the case" within article 36.14 of code of criminal procedure unless and until defense counsel raises issue by requesting jury instruction on issue); *see also* 43A George E. Dix & Robert O. Dawson, *Texas Practice: Criminal Practice and Procedure* § 42.224 (2d ed. 2001).

Defense counsel may not want the "no adverse inferences" instruction given for a variety of reasons.[12] The trial court is entitled to know that the defendant is foregoing the giving of the instruction in question.[13] In the absence of a proper request or timely objection, the trial court is under no obligation to give the instruction and does not err in excluding the instruction in the jury charge.

In the instant case, appellant made no request for or objection to the failure of the trial court to *sua sponte* give a no adverse inferences jury instruction at the punishment stage of the trial. There was no error, and without an error, there is no need for a harm analysis. The seventh point of error is overruled.

---

[12] Defense counsel frequently complain when the no adverse inferences instruction is given in the jury charge. *See Jefferson v. State*, 501 S.W.2d 322, 326 (Tex. Crim. App. 1973); *Handley v. State*, 480 S.W.2d 738, 741 (Tex. Crim. App. 1971); *Smith v. State*, 455 S.W.2d 748, 754 (Tex. Crim. App. 1970). When requested by the defense not to give the instruction, the better practice for the trial court is to omit the instruction. *Lujan v. State*, 626 S.W.2d 854, 863 (Tex. App.—San Antonio 1981, pet. ref'd).

Defendants who testify at the guilt stage of a jury trial and deny guilt often find themselves in an awkward position after conviction. If they testify at the punishment phase and express remorse for the crime committed, the jury may well infer they were lying at the earlier stage of the trial. If the defendants continue to assert their innocence in their subsequent testimony, the jury may not favorably view such action.

[13] A trial court should not be "sandbagged" by the failure of the defendant counsel to request a no adverse inferences instruction and a later claim on appeal that the defendant's constitutional rights were violated by the trial court's failure to give the jury instruction.

The judgment is affirmed.

_____

John F. Onion, Jr., Justice

Before Chief Justice Law, Justices Puryear and Onion[*]

Affirmed

Filed:   February 2, 2006

Publish

---

[*]   Before John F. Onion, Jr., Presiding Judge (retired), Court of Criminal Appeals, sitting by assignment.  *See* Tex. Gov't Code Ann. § 74.003(b) (West 1998).