# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-08-00506-CR

**Eddie Ray Shaw, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF BASTROP COUNTY, 21ST JUDICIAL DISTRICT
### NO. 12,621, HONORABLE REVA TOWSLEE CORBETT, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury found appellant Eddie Ray Shaw guilty of indecency with a child by contact, *see* Tex. Penal Code Ann. § 21.11 (West 2003), and assessed punishment at eight years' imprisonment and a $2,500 fine. The sentence and fine were suspended and Shaw was placed on community supervision for eight years. In five points of error, Shaw argues that the evidence was legally and factually insufficient to support the verdict, that the trial court abused its discretion in admitting testimony regarding Shaw's unrecorded oral confession, that the trial court erred in not including certain unadmitted evidence in the appellate record, and that trial counsel was ineffective for failing to make an offer of proof regarding the unadmitted evidence. Having found no reversible error, we affirm the judgment of conviction.

## BACKGROUND

Late in the evening on October 17, 2006, Shaw's sixteen-year-old step-daughter, S.M., was in her bedroom in the mobile home she shared with her mother, her maternal aunt, her cousin, and Shaw. While walking through the home, Shaw noticed the light on in S.M.'s room; he peeked in through the door and observed S.M. taking pictures of herself in the mirror while wearing only an unzipped hooded sweater and thong underwear.[1] Shaw then went into the room to speak to S.M. What happened while he was in the room is largely disputed.

According to S.M., she noticed a hand in the crack of the door and "I stood up real fast because I was like, oh, my gosh, and [Shaw] walked in and asked me what I was doing." S.M. testified that she told Shaw she was taking pictures of herself because she was bored. Shaw originally told S.M. he was going to go get her mother but S.M. testified that Shaw changed his mind because "he decided he didn't want me to get in a lot of trouble." Then, Shaw came forward and gave S.M. a hug. S.M. testified about the hug as follows:

> A: He put his hands underneath my sweater and they went behind my back and grabbed my butt.
>
> Q: All right. Now what did you have underneath [the] hoodie?
>
> A: Nothing.
>
> Q: Did you have on panties?
>
> A: Yes.

---

[1] S.M. testified at trial that the sweater could not be zipped up because the zipper was broken.

Q: Can you tell the jury what kind of panties you had on?

A: A thong.

Q: Okay, so, [S.M.], basically—and I'm sorry to ask you this, but the thong really doesn't cover your behind, does it?

A: No.

Q: Okay. So again, he grabbed your butt, then what?

A: Then, whenever he was bringing his hands back up he came back up and through—I don't know how to describe that.

Q: You're making a motion for the jury, so why don't you describe as best you can—tell the jury as you're making the motion what you're trying to get them [to] understand, as far as the touching?

A: He touched my breast like that.

Q: Okay. And again, that was inside the hoodie?

A: Yes.

Q: What was going through your mind at this time?

A: I was really scared.

On cross-examination, S.M. further described the way Shaw touched her, saying:

A: He had grabbed my butt and then whenever he was sticking his hand under my sweater he went past [my] breast and went like—pushed them like that.

Q: The sides of your breast?

A: Yes.

Q: So he didn't grab or grope or squeeze or fondle or anything like that?

A: No.

According to S.M., Shaw then sat down in a chair and she sat on the bed and they talked for a few minutes. S.M. testified that she was still in shock and scared and could not remember much of the conversation, just that Shaw told her once again that "he didn't want to get my mom involved because he didn't want to get me into too much trouble." S.M. further testified that, before Shaw left the room, he reached across and tried to open up her sweater in order to see her bare breast again.

Shaw's testimony at trial contradicted S.M.'s version of events. According to Shaw, when he first saw S.M. in front of the mirror "with the phone up," he backed away from her door and went into the kitchen. Shaw testified, "I sat there and thought about it for a minute and I thought she had a camera in her phone, so that's when I walked back into her room and I opened the door and I asked her what are you doing . . . ." S.M. then stood up and, according to Shaw, she covered herself with her hooded sweater and held the sweater closed the entire time he was in the room.[2] Shaw testified that they talked for a few minutes and then:

> I was standing in the door and she came up and I reached over and I kissed her on the cheek and I hugged her. My hand touched her bottom and I moved it, when I did she grabbed it and then we stood there and talked for a minute.

Shaw denied ever touching S.M.'s breast and claimed that he was not aware that she was wearing thong type underwear until his hand touched her bare skin and that he immediately removed his

---

[2] Shaw's testimony varied as to whether S.M. was standing or sitting in front of the mirror when he first saw her. At first, he testified that she was standing. But, he later said she "stood up" and testified that she had been sitting and so he knew she was wearing a sweater but did not know what else she was wearing until she stood up. He then testified again that he observed her standing sideways in front of the mirror.

4

hand. Shaw testified that at some point after the hug S.M. asked if she could put on shorts. He turned away while she did so and then the two sat down and continued their discussion for ten to fifteen minutes before he returned to his bedroom.

After Shaw left the room, S.M. jumped out the window and went across the street to the home of her neighbor, Keith.[3] According to Keith, S.M. walked up with a blanket wrapped around her arm and:

> I thought her arm got broke or cut off because she was just crying hysterically. I was like, what's wrong? You know, what's the matter? She wouldn't say anything and I just kept on asking what's wrong, what's wrong. I finally pulled her arm out of the blanket to make sure that it wasn't broke because that's what it looked like, and she said, I could have sworn, "Eddie, Eddie, he touched me again." If not, it was something identical to that. And my exact response, I remember that with no problem, it was like "Whoa, whoa, I do not want to hear this." That was getting into something I don't think I could help her with.

Keith told S.M. that she needed to either get help from one of the other adults in her house or call a friend to come pick her up.

S.M. then called Della, the mother of a school friend. Della testified that when S.M. called, "she sounded like she was crying, upset." S.M. told Della that Shaw had touched her inappropriately and that she was afraid to go back home and asked Della to come pick her up. Della brought S.M. to Della's house and called S.M.'s aunt, Sandy, to let her know where S.M. was and that she was safe. Sandy spoke with S.M.'s mom, Debbie, who then drove over and spoke to both Della and S.M. about what happened. S.M. spent the night at Della's house and returned

---

[3] In order to help protect S.M.'s identity, we will refer to adult friends and family, other than the defendant, by their first name only.

home the next day. A couple of weeks later, when Della learned that S.M.'s mom had not reported the incident, Della sent an email to the child abuse hotline.

After Della filed the complaint, Detective Joel Wade of the Bastrop County Sheriff's Department was assigned to investigate the case. As part of his investigation, Wade interviewed Shaw on more than one occasion. After the first interview, on November 6, 2006, Wade asked Shaw to provide a written statement recounting the events of October 17. Shaw wrote:

> On or about Oct. 17, 2006 I had got up to take my nightly stroll thru the house and get a cigarette and had noticed [S.M.'s] light was on. Went and cracked the door open and seen her standing in front of the mirror side ways taking pictures of herself with nothing but her pant[ies] on. And now that I think about this she was posing and it is not normal for this girl. So I went back to the kitchen and sat down and thought about what [I] had seen so I got back up and went back to her room and ask what are you doing and I hug her, my hands did touch her rear but not in any kind [of] groping motion. [J]ust mainly trying to give her an opportunity to tell me what she was doing taking pictures of herself and what she was doing with them. So after I hug her she sat down on the bed and [I] sat in [the] chair in front of her and was asking questions on things that had happened a few months prior to this time. [Which] she still does not want to tell her part in all of that.
>
> After our discussion I returned back to the kitchen and sat down still trying to make some kind of [sense] in the behavior. While I was sitting[,] Sandy had received a phone call that [S.M.] had jumped out the window [and] called Della.

The next time Shaw came to the police station, on November 15, 2006, he first spoke with Sergeant Donald Clendennen of the Department of Public Safety. The interview was not taped, but Clendennen testified over defense objections about what Shaw said during the interview. Clendennen testified that Shaw initially denied touching S.M.'s breast, but, about an hour and a half

6

into the interview, he admitted that he did so.[4] According to Clendennen, Shaw said that when he hugged S.M. he first grabbed her buttocks and then:

> He said that his hands eventually—he slid[] his hand[s] up over her hips and her waist and then they continued up inside the sweater until his hands came in contact with her breast on the side and then he moved them around—this is him describing, eventually—they were on the side, went underneath and then over the top. Both hands on both breasts.

Clendennen also testified that Shaw said that he had touched S.M. because "he derived sexual pleasure from it." Clendennen concluded the interview soon after obtaining Shaw's confession.

Shaw then spoke with Detective Wade, who asked Shaw to write down what he had told Clendennen. Shaw wrote:

> I walked in [S.M.]'s room and asked her what she was doing taking pictures of herself. I talked to her and ask for a hug when she turned and her sweatshirt flew open I reached through and slid my hands by her breast[,] grab her but[t] and pulled her close for a hug[,] kissed her on the cheek[,] and started talking to her.
>
> I am very sorry for this and I will proseed [sic] in getting help and hopfully [sic] understand why I did this.
>
> I got up and walked in the living Rm. and noticed that [S.M.]'s light was still on at 1:20 a.m. When I cracked the door open and picked [sic] in I saw her standing side ways with nothing but her pantys [sic] on and a phone taking pictures of herself.
>
> This is the reason I went into her room.

---

[4] The initial part of the interview was a polygraph examination of Shaw, which lasted approximately an hour and twenty minutes. After completing the test, Clendennen continued to question Shaw, and Shaw's responses to these later statements were the subject of Clendennen's testimony before the jury.

Prior to trial, Shaw made motions in limine to suppress his written and oral statements. Wade and Clendennen were then questioned at trial outside the presence of the jury regarding the circumstances of the statements. Wade testified that Shaw voluntarily came to the police station on November 6 and, at the beginning of the interview, Shaw "was advised that he was not under arrest . . . and that he was free to leave whenever he so desired" and was given *Miranda* warnings.[5] In addition, the form on which Shaw wrote his statement detailed his rights, and Wade testified that "I asked him if he would read through them and I asked him if he understood them and he said that he did." Regarding the November 15 statements, Wade testified that Shaw once again came to the station voluntarily. Wade greeted Shaw and informed him that he was not in custody before escorting him to a back room in the police station where Shaw met with Clendennen. Clendennen testified that he told Shaw "several different times, several different ways" that Shaw was free to terminate the interview and leave at any time. After the interview was over, Shaw met with Wade, who reiterated to Shaw that his *Miranda* rights were still in effect before asking him to write down what he had told Clendennen. Based on Wade's and Clendennen's testimony, the judge overruled the defense objections and admitted all three statements.

When Shaw testified later in the trial, he disputed Clendennen's description of his oral statement and disavowed his second written statement. Shaw stated that, after two hours of interrogation by Clendennen, "He had me so shook up, he could have said I did anything and I would have said yes. I had just had enough, I wanted it done. I wanted out of there." According to Shaw, "I told him whatever you say I did, I did. And that was my words to him. Whatever you say, I did it.

---

[5] *Miranda v. Arizona*, 384 U.S. 436 (1996).

8

I'm done, that's it. I had been tired of being drilled. And that was my exact words." Shaw claims that, after he gave in, he was instructed to write another statement: "I was still a little shaken. I handed it to [Wade] and he was the one, you know, that at that time he was the one that told me to write, you know, that you was sorry." Shaw maintained that his first written statement, from November 6, was the accurate statement of his interaction with S.M. He testified that he never actually touched S.M.'s breast, that she kept herself covered the entire time he was in the room, and that he was not sexually aroused or gratified by the encounter.

S.M.'s mother and aunt also testified at trial on Shaw's behalf. Both women testified that Shaw often checked to make sure all of the lights are out at night. Debbie, S.M.'s mother, further testified that if Shaw saw S.M.'s light on after her usual 10:00 p.m. bedtime, it would be normal for him to check on her. Debbie said she had spoken with both Shaw and S.M. about what happened in S.M.'s bedroom that night and that she believed what Shaw told her—that he gave S.M. a kiss on the cheek, hugged her, and tugged on the lapel of her sweater—because, "I know Eddie and he would not even entertain the thought of ever hurting my daughter, ever." S.M.'s aunt, Sandy, also credited what Shaw told her, which was that "he gave her a hug and told her she shouldn't be doing things like that and told her she had to go to bed." Shaw told Sandy that "when he was walking out he popped her on the butt and said go to bed." Sandy also testified that S.M. and Shaw had a "normal" father-daughter-type relationship before October 17, 2006, but that during the month after the events in question, S.M. "was just quiet. She would go to her room and he would go to his."[6]

---

[6] S.M. continued to live with her mother for a month after the events in question. After that, she lived with her adult brother for a month before moving in with her father.

During the trial, Shaw sought to discover letters to and from S.M. that were in the possession of the prosecution, and which Shaw argued were potentially exculpatory *Brady* material.[7] The trial court conducted an in camera review of the letters and determined that they were not relevant to the issues at trial and therefore were not discoverable or admissible.

## DISCUSSION

In five points of error, Shaw challenges the legal and factual sufficiency of the evidence (points of error one and two), argues that the trial court erred in admitting Clendennen's testimony regarding Shaw's unrecorded oral statement (point of error three) and in failing to include the letters to and from S.M. in the appellate record (point of error four), and contends that his counsel was ineffective for failing to make an offer of proof regarding the letters (point of error five). Because the question of whether Shaw's unrecorded oral statement was properly before the jury impacts the evaluation of the factual and legal sufficiency of the evidence, we will address the issue of its admissibility first.

**Shaw's Unrecorded Oral Confession**

Shaw contends on appeal that the trial court erred by refusing to suppress his oral statement to Clendennen because it was the product of custodial interrogation and was not electronically recorded as required by article 38.22 of the code of criminal procedure.[8] *See* Tex. Code Crim. Proc. Ann. art. 38.22, § 3 (West 2005). Under article 38.22, an oral statement made

---

[7] *Brady v. Maryland*, 373 U.S. 83 (1963).

[8] On appeal, Shaw does not assert any error based on the trial court's admission of his two written statements.

by the accused during a custodial interrogation is inadmissible in a criminal proceeding against him unless an electronic recording of the statement is made after the accused has been given and waived *Miranda* warnings.[9]  *Id.*; *see Cedillos v. State*, 250 S.W.3d 145, 151 (Tex. App.—Eastland 2008, no pet.).  However, article 38.22 does not apply if the accused is not in custody at the time he makes the statement.  Tex. Code Crim. Proc. Ann. art. 38.22, § 3; *Herrera v. State*, 241 S.W.3d 520, 525 (Tex. Crim. App. 2007).  Therefore, the pertinent question is whether Shaw was "in custody" when he made the statements to Clendennen.

---

[9]  Article 38.22 of the code of criminal procedure provides that:

(a) No oral or sign language statement of an accused made as a result of custodial interrogation shall be admissible against the accused in a criminal proceeding unless:

> (1) an electronic recording, which may include motion picture, video tape, or other visual recording is made of the statement;
>
> (2) prior to the statement but during the recording the accused is given the warning in Subsection (a) of Section 2 above and the accused knowingly, intelligently, and voluntarily waives any rights set out in the warning;
>
> (3) the recording device was capable of making an accurate recording, the operator was competent, and the recording is accurate and has not been altered;
>
> (4) all voices on the recording are identified; and
>
> (5) not later than the 20th day before the date of the proceeding, the attorney representing the defendant is provided with a true, complete, and accurate copy of all recordings of the defendant made under this article.

Tex. Code Crim. Proc. Ann. art. 38.22, § 3(a) (West 2005).

11

In determining whether an individual was in custody, courts examine the objective circumstances surrounding the interrogation. *Herrera*, 241 S.W.3d at 525; *Dowthitt v. State*, 931 S.W.2d 244, 255 (Tex. Crim. App. 1996). A person is in custody only if, under the circumstances, a reasonable person would believe that his freedom of movement was restrained to the degree associated with a formal arrest. *Herrera*, 241 S.W.3d at 525; *Dowthitt*, 931 S.W.2d at 254. The question of whether the accused was in custody thus presents a mixed question of law and fact. *Herrera*, 241 S.W.3d at 526. We afford almost total deference to a trial judge's custody determination when the questions of historical fact turn on credibility and demeanor. *Id.*; *Guzman v. State*, 955 S.W.2d 85, 88-89 (Tex. Crim. App. 1999). We review de novo mixed questions of law and fact that do not turn on credibility and demeanor. *Guzman*, 955 S.W.2d at 89.

Shaw acknowledges that the interview began as a voluntary, non-custodial interview; he came to the police station voluntarily, submitted to the polygraph examination voluntarily, and was advised of his *Miranda* rights and told he could terminate the interview at any time. Shaw argues, however, that once the polygraph was completed, "the tone, demeanor, and purpose of the interview changed dramatically" and the interview became custodial. His argument is contradicted by Clendennen, whose testimony was the only evidence before the trial court when it made the custody determination.

According to Clendennen, Shaw "was told he could terminate the interview at any time; he was free to go at any time. He was told several different times, several different ways." Clendennen testified that Shaw understood the warnings and signed forms indicating that his presence at the interview was voluntary. The first hour and twenty minutes of the interview

12

was a polygraph examination, then Clendennen began a "sit-down" interview with Shaw. While Clendennen acknowledged that, after the polygraph examination was completed, all of his questions were aimed at gaining a confession, he also testified that the interview consisted mainly of "open-ended questions" and remained "completely voluntary" throughout the two hours.

Shaw contends that continued questioning after a polygraph examination in an attempt to garner a confession makes the interview custodial, citing to *Bailey v. State*, 281 S.W.3d 29 (Tex. App.—El Paso May 19, 2005, no pet.). However, "custody does not occur merely because the suspect submits to and fails a polygraph test," *Dowthitt*, 931 S.W.2d at 255, nor does custody occur merely because the interviewee is the focus of the investigation, *see Cedillos*, 250 S.W.3d at 152. In *Bailey*, the defendant was in custody on a separate charge at the time of the interview, was brought to the interview location by a police officer, and was returned to jail after the interview. *Bailey*, 281 S.W.3d at 34-35. In contrast, Shaw was not under arrest, came to the police station of his own accord, was told he could leave at any time, and freely left the station after the interview. *See Cagle v. State*, 23 S.W.3d 590, 592 (Tex. App.—Fort Worth 2000, pet. ref'd) ("Here, Andrews testified that she did not force appellant to come to her office, that the police did not pick him up, that she did not place him under arrest, that he could leave the CPS office at any time, and that he did in fact freely leave her office after the meeting. Under these uncontroverted circumstances, an innocent, reasonable person would not feel restrained to the degree of a formal arrest."); *see also Bailey*, 281 S.W.3d at 35 (distinguishing facts from those of *Cagle*). If Shaw was uncomfortable with continuing the interview after the polygraph examination ended, he was free to leave the station

13

house or request to speak to an attorney. Clendennen testified that, had Shaw done so, he would have immediately ended the interview and allowed Shaw to leave.

The circumstances of the interview, as described by Clendennen, were not such as would cause a reasonable person to believe he could not leave freely. *See Herrera*, 241 S.W.3d at 525; *Dowthitt*, 931 S.W.2d at 254. Thus, Clendennen's testimony supports a finding that the interview in its entirety was non-custodial and therefore supports the trial court's decision to admit the statement.

Later in the trial, Shaw testified regarding the circumstances of the interview and painted an entirely different picture.[10] According to Shaw, Clendennen's questioning reminded him of a drill sergeant and left him feeling "backed in a corner." Shaw testified, "[Clendennen] had me so shook up, he could have said I did anything and I would have said yes. I had just had enough, I wanted it done. I wanted out of there." Thus, according to Shaw, the only way he could end the interview was to falsely confess. While Shaw's testimony could support an inference that the interview became custodial, resolving the conflict between Shaw's and Clendennen's testimony regarding the interview's atmosphere requires a credibility assessment. When making a suppression determination, the trial court is the exclusive judge of the credibility of the witnesses and the weight to be given their testimony. *See Turner v. State*, 252 S.W.3d 571, 576 (Tex. App.—Houston

---

[10] Generally, we would look only to the evidence that was before the trial judge at the time he made his suppression ruling. However, when the alleged error is the admission of evidence at trial and the issue was consensually litigated there, the evidence is considered to have been re-opened. *Barley v. State*, 906 S.W.2d 27, 31 n.2 (Tex. Crim. App. 1995).

14

[14th Dist.] 2008, pet. ref'd). The trial court was free to believe Clendennen's version of events and did not abuse its discretion in doing so.

Because the evidence before the trial court supports a finding that the interview was non-custodial, the trial court did not abuse its discretion in admitting Shaw's oral statement. We overrule Shaw's third point of error.

**Legal and Factual Sufficiency of the Evidence**

In his first and second points of error, Shaw argues that the evidence was legally and factually insufficient to prove the charged offense of indecency with a child by contact.

In reviewing the legal sufficiency of the evidence, we review all of the evidence in the light most favorable to the verdict. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). The question presented is whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *Clayton*, 235 S.W.3d at 778. We assume that the trier of fact resolved conflicts in the testimony, weighed the evidence, and drew reasonable inferences in a manner that supports the verdict. *Clayton*, 235 S.W.3d at 778.

In reviewing the factual sufficiency of the evidence, we consider all the evidence in a neutral light, while giving due deference to the jury's determination. *See Sims v. State*, 99 S.W.3d 600, 601 (Tex. Crim. App. 2003); *Vasquez v. State*, 67 S.W.3d 229, 236 (Tex. Crim. App. 2002). This involves a two-part inquiry. *See Johnson v. State*, 23 S.W.3d 1, 6-7 (Tex. Crim. App. 2000). We first look at the evidence presented in support of the guilty verdict and reverse only if the evidence "is so weak as to be clearly wrong and manifestly unjust." *Id.* at 11. If the evidence that

15

tends to prove the verdict is sufficient standing alone, we then compare it with the evidence the defendant produces against the verdict, *id.* at 7, and reverse only if after the comparison the verdict "is against the great weight and preponderance of the available evidence," *id.* at 11.  The jury is the sole judge of the credibility of the witnesses and the weight to be accorded their testimony.  *Vasquez*, 67 S.W.3d at 236.  We may not reweigh the evidence and substitute our judgment for that of the jury. *Watson v. State*, 204 S.W.3d 404, 417 (Tex. Crim. App. 2006); *King v. State*, 29 S.W.3d 556, 563 (Tex. Crim. App. 2000).

To prove the offense of indecency with a child by contact, the State had to prove (1) that S.M. was less than 17 years of age, and (2) that Shaw touched S.M.'s breast (3) with the intent to arouse or gratify his sexual desires.  *See* Tex. Penal Code Ann. § 21.11; *Pizzo v. State*, 235 S.W.3d 711, 715 (Tex. Crim. App. 2007); *Perales v. State*, 226 S.W.3d 532, 534-35 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd).  Shaw argues that the State only proved incidental contact with S.M.'s breast and therefore did not prove the third element—that he touched S.M. with the intent to arouse or gratify his sexual desires.  Shaw claims that the evidence shows instead that he went into the room for a legitimate reason—to discuss his concerns about her taking pictures of herself while scantily clad—that he hugged her in a "step-fatherly fashion," and that any contact with her was incidental and not with sexual intent.

There is rarely direct evidence of what an accused intended; therefore, the fact-finder must usually infer intent from circumstantial evidence.  *See Hernandez v. State*, 819 S.W.2d 806, 810 (Tex. Crim. App. 1991); *Scott v. State*, 202 S.W.3d 405, 408 (Tex. App.—Fort Worth 2006, pet. ref'd).  In the context of indecency with a child, the intent to arouse or gratify may be inferred

16

from the accused's conduct alone. *Connell v. State*, 233 S.W.3d 460, 467 (Tex. App.—Fort Worth 2007, no pet.); *Scott*, 202 S.W.3d at 408. Intent to arouse or gratify can also be inferred from the defendant's behavior after the incident. *See Perales*, 226 S.W.3d at 535; *Couchman v. State*, 3 S.W.3d 155, 163 (Tex. App.—Fort Worth 1999, pet. ref'd). In this case, the jury could have inferred that Shaw intentionally touched S.M.'s breast and that he did so with the intent to arouse or gratify his sexual desires based on (1) S.M.'s testimony regarding Shaw's conduct, (2) Shaw's oral and written statements from November 15, and (3) Shaw's actions after the incident.

*S.M.'s Testimony*

S.M. testified that Shaw hugged her while she was clothed in only a thong and an unzipped hooded sweater, "grabbed" her buttocks, and slid his hands inside her sweater, up her side, and to her breasts. Shaw argues that, because S.M. testified that Shaw did not grope or fondle her breasts, the conduct she testified to is not enough to support an inference of sexual intent. We disagree. Shaw did not ask S.M. to get dressed so that he could speak with her, nor did he speak to her mother about what he had seen. Instead, he chose to enter the room and request a hug from a sixteen-year-old girl who was dressed only in an unzipped sweater and a thong. Furthermore, when hugging her, he put his hands inside her sweater, "grabbed" her bare buttocks, slid his hands up the sides of her bare torso, and "pushed her breasts to the side"—none of which is consistent with a "step-fatherly" hug. Rather, such conduct is consistent with an intent to arouse or gratify his sexual desires.[11] Shaw's sexual intent can also be inferred from the fact that he repeatedly told S.M. that

---

[11] We also note that Keith's and Della's description of S.M.'s demeanor after the incident is consistent with S.M.'s version of events rather than with Shaw having simply given her a "step-

he was not going to tell her mother about her behavior. The jury could have concluded that Shaw was warning S.M. that if she told her mother about their encounter, she would get in trouble.

Shaw argues that S.M.'s version of events cannot be credited, because she accused him of touching her breast in an effort to deflect attention away from what he deems her "inappropriate" behavior before he entered the room. However, it is the jury's job to assess the credibility of a witness. *Vasquez*, 67 S.W.3d at 236. The jury was free to believe S.M.'s testimony about what transpired in her room that night and to draw reasonable inferences from that testimony. *See Connell*, 233 S.W.3d at 466 (complainant's testimony alone is sufficient to support conviction for indecency with child).

*Shaw's November 15 Statements*

Shaw's conduct as he himself described it in his November 15 oral and written statements also supports an inference that he intentionally touched S.M.'s breast with the intent to arouse or gratify his sexual desires. According to Clendennen, when asked why he touched S.M.'s breast, Shaw told Clendennen "that he derived sexual pleasure from it."[12] This testimony alone is enough to allow a reasonable jury to conclude beyond a reasonable doubt that Shaw touched S.M. with the intent to arouse or gratify his sexual desires. In addition, the way that Shaw described his actions to Clendennen—that he slid his hands up over her hips and waist and then to and around

---

fatherly" hug. Keith testified that S.M. was "crying hysterically" and "Della testified that when she spoke to S.M. on the phone, S.M. "sounded like she was crying and upset" and that when she went to pick S.M. up, S.M. "acted like she was kind of scared, she was upset, teary eyed."

[12] At trial, Clendennen was asked whether Shaw used that exact phrase—"sexual pleasure"—to describe his intent and Clendennen responded that he was "absolutely" positive that Shaw used that phrase.

18

S.M.'s breasts—also support an inference that his actions were aimed at arousing his sexual desires. Even the written statement, which contains a tamer account of Shaw's actions, supports an inference of sexual intent. As discussed above, there is nothing "step-fatherly" about a hug in which Shaw put his hands under S.M.'s sweater and slid them up to her breasts. While Shaw later disavowed these statements, the jury, as the trier of fact, is the sole judge of the credibility of a witness and may believe or disbelieve any part of a witness's testimony. *Vasquez*, 67 S.W.3d at 236; *Johnson*, 23 S.W.3d at 7. The jury was presented with Shaw's testimony regarding the pressure he felt during the interview and his desire to say whatever was necessary to get out of the room. The jury also heard Clendennen testify that the interview was "very casual [and] laid back" and that Shaw never showed any hesitation about continuing the interview. The jury was then free to assess the credibility of both witnesses and judge for itself who to believe. Based on the evidence presented, the jury found Shaw's testimony at trial unpersuasive.

*Shaw's Post-Incident Conduct*

Finally, Shaw's conduct following the incident—specifically his ever-changing version of the events—supports an inference that he possessed the requisite intent. *See Perales*, 226 S.W.3d at 535 (defendant's initial denial of touching child followed by admission of touching but with claim that it was for legitimate purposes supports inference of sexual intent); *Couchman*, 3 S.W.3d at 163 (same). While Shaw initially denied touching S.M.'s breast at all, he later admitted doing so in both oral and written statements. While he later disavowed these statements at trial, his version of what happened during the conversation with S.M. varied each time he told his story. At trial, he was inconsistent on whether S.M. was standing sideways—such that he could have

19

clearly seen that she was wearing only a thong—or sitting when he first observed her. He told Sandy that he "popped" S.M. on the bottom, but neglected to mention this to Debbie. He told Debbie that he "tugged" on the lapel of S.M.'s sweater, but did not mention this to Sandy or in any of his statements to the police. Further, he did not mention the important details that S.M. held her sweater closed the entire time he was in the room and put on shorts before he left the room until trial. Shaw's inconsistent stories support an inference that he was trying to conceal his actions and his sexual intent.

Viewing all of the evidence—S.M.'s testimony regarding Shaw's actions, Shaw's oral and written statements from November 15 regarding his actions and intent, and his conduct after the incident—in the light most favorable to the verdict, we conclude that a reasonable jury could have concluded beyond a reasonable doubt that Shaw touched S.M.'s breast with the intent of arousing or gratifying his sexual desires. Therefore, the evidence is legally sufficient.

Viewing this same evidence in a neutral light, we conclude that the evidence supporting the jury's verdict is not so weak as to render the verdict clearly wrong and manifestly unjust. Shaw's testimony at trial that he hugged S.M. but did not see or touch her bare breasts is not so persuasive as to render the guilty verdict against the great weight and preponderance of the evidence. Therefore, the evidence is factually sufficient. We overrule Shaw's first and second points of error.

**S.M.'s Letters**

At trial, Shaw sought to discover certain letters to and from S.M. that were in the possession of the prosecution. While a defendant does not have a general right to discovery

20

of evidence in the possession of the State, *see Michaelwicz v. State*, 186 S.W.3d 601, 612 (Tex. App.—Austin 2006, pet. ref'd), he does have a right to evidence that is favorable to him and material to his guilt or punishment, *see Brady v. Maryland*, 373 U.S. 83 (1963); *Ex parte Adams*, 768 S.W.2d 281, 293 (Tex. Crim. App. 1989); Tex. Code Crim. Proc. Ann. art. 39.14 (West Supp. 2008) (describing when State's evidence is discoverable by defense). When the prosecution has refused to turn over certain evidence, the defendant has a due process right to have the trial court examine the requested evidence in camera and then order the disclosure of any discoverable evidence.[13] *See Thomas v. State*, 837 S.W.2d 399, 407 (Tex. Crim. App. 1992); *Michaelwicz*, 186 S.W.3d at 614. Here, the trial court conducted an in camera review of the letters and ruled that the evidence was not discoverable, saying, "There is absolutely nothing contained within any of those documents that have anything to do with this case, therefore I'm ruling that they are not admissible. . . . [T]hey are not discoverable because they are not *Brady* and I do believe they have absolutely no value whatsoever to this case."

In his fourth point of error, Shaw argues that the trial court erred in not including the letters in the appellate record so we could review the lower court's *Brady* determination. Shaw requests that we abate the case and order the trial court to supplement the record with:

> copies of the evidence reviewed by the court along with any necessary testimony and/or findings of fact regarding such evidence, including, but not limited to, evidence regarding the source of the excluded evidence, how the excluded evidence came to be in [the] possession of the State, who provided the excluded evidence to

---

[13] To be entitled to in camera review, the defendant must first show there is a "probable" or "reasonable" probability that the evidence at issue contains *Brady* material. *See Michaelwicz v. State*, 186 S.W.3d 601, 614 (Tex. App.—Austin 2006, pet. ref'd).

the State, and the specific reasoning of the trial court as to why the excluded evidence did not amount to *Brady* or otherwise discoverable material.

Based on the record before us, we hold that the trial court did not err and that the matter does not need to be abated because (1) the information regarding the source of the evidence and how it came to be in the possession of the State is evident from the record, (2) the trial court already provided detailed findings of fact regarding why the letters were not *Brady* material, and (3) Shaw did not request that the letters be sealed and included in the appellate record for our review.

The record before us contains the facts regarding the letters that Shaw requests and indicates that his trial counsel knew how and from whom the State obtained the evidence before he requested the in camera review. The first mention of the letters came when defense counsel questioned Detective Wade outside the presence of the jury:

> Q:    I think sometime later on in the next week or so, I think November 17th, Debbie [] came to your office with a letter or with a document she had; is that correct?
>
> A:    She had some notes, yeah.
>
> Q:    And what did those notes contain?
>
> A:    Just teenage talk between two girls in school, or whatever.
>
> Q:    They are between her and who else?
>
> A:    I'm not sure who they're all from, some are signed, some aren't.
>
> . . .
>
> Q:    Do you have possession of those letters or were they turned over to the DA's office?

A:      I do not have them in my possession right now.

Q:      Do they have them—were they turned over to the DA's office?

A:      Yes, I believe they were, possibly. I don't remember for sure.

This line of questioning makes it clear that the State obtained the letters on or near November 17, 2006, when S.M.'s mom, Debbie, gave the letters to Wade.

Shaw's trial counsel also asked Wade about the content of the letters and he replied that they were "basically one girl writing another girl about what they thought about sex, or, you know, dreams." Wade further testified that the letters did not mention the night in question, saying: "There was no mention in any of those letters, whatsoever, about that particular incidence [sic] with the phone. There was nothing in the letters, in any of the letters, that said that on this night I was doing this with my phone." Based on this description, the trial court indicated that the letters were likely irrelevant to the issues at trial—and thus neither discoverable nor admissible—but agreed to conduct an in camera review of the letters before making a final ruling.

After reviewing the letters, the trial court ruled that they were neither discoverable nor admissible because they were not relevant to the issues at trial. *See* Tex. Code Crim. Proc. Ann. art. 39.14 (authorizing discovery of material evidence within possession of State); Tex. R. Evid. 402 ("Evidence which is not relevant is not admissible."). Defense counsel, noting the difficulty he faced in persuasively arguing for discovery without knowing the content of the letters, requested that the trial court make findings of fact regarding the letters. The following exchange then took place:

23

The Court: Well, those will be my findings of fact, that they are letters written amongst teenagers, there is no date and time on any of them for me to determine when they were written. The majority of the letters were not even written by the witness, they are written by other parties. I can make a more detailed record if you want later on but that's all I'm going to give you right now.

Defense Counsel: I guess as far as detail, the subject matter of the letters and whether or [not] they were—uh—

The Court: The subject matter seems to be teenagers discussing life situations, and some of them do, as I believe you asked one of the officers, relate[] dream sequences but not real life. The majority of them have—they have no mention, and I'll say it again, absolutely no mention of this defendant, no mention of this case and absolutely nothing to do with this case.

Defense Counsel: And no mention of anything that transpired on the date of this case?

The Court: Nothing whatsoever. Nothing to do with this case, nothing about this defendant, nothing about what happened to him, not a thing at all.

Defense Counsel: Ok, thank you, Your Honor, we may at some point ask for findings of facts.

The Court: I can give you findings of facts but I don't know how to be any more detailed than what I've just given you.

The trial court's responses constitute oral findings of fact and clearly explain that the letters are not discoverable because they are not even relevant to the issues at trial, much less exculpatory and material to the defendant's guilt.[14]

---

[14] Furthermore, based on what we do know about the content of the letters—from Wade's testimony and the trial court's findings of fact—we are confident that the trial court did not err in its rulings. Both Wade and the trial court noted that the letters contained no mention of the night in question. The trial court further found that the letters contained no mention of the defendant. Thus,

24

After the trial court ruled that the letters were neither discoverable nor admissible and made its findings of fact, Shaw did not request that the letters be sealed and placed in the appellate record for our review. Thus, the trial court did not err by not including the letters sua sponte. Rather, Shaw waived any right to challenge the trial court's ruling that the evidence was undiscoverable and inadmissible when he failed to request that the material be included in the record. *See Guidry v. State*, 9 S.W.3d 133, 153 (Tex. Crim. App. 1999) (error regarding exclusion of evidence is not preserved unless record indicates what excluded evidence would have been); *Villareal v. State*, 576 S.W.2d 51, 65 (Tex. Crim. App. 1978) (accused waived possible *Brady* error by failing to secure inclusion of prosecutor's file in record).

For the foregoing reasons, we hold that the trial court did not err in failing to include the letters in the appellate record. We overrule Shaw's fourth point of error.

**Ineffective Assistance of Counsel**

In his fifth point of error, Shaw contends that his trial counsel was ineffective for failing to make an offer of proof regarding the letters or otherwise ensure that they would be included in the appellate record for our review.

---

the letters were not relevant to the key question at trial—whether Shaw touched S.M.'s breast with sexual intent on October 17, 2006.

At trial and on appeal, Shaw indicates that the letters might contain evidence to support a theory that S.M. was using her phone to send pictures of herself and/or engaging in "phone sex" and thus bolster his testimony that he went into S.M.'s room because he was concerned about her behavior. However, Shaw's reason for entering S.M.'s room that night is only tangentially related to the real issue at trial, which was his conduct after he entered her room. Our conclusion is bolstered by analogy to Texas's rape shield law, which protects victims of sexual assault from just such an airing of their past sexual behavior. *See* Tex. R. Evid. 412.

25

In reviewing a claim of ineffective assistance of counsel, we first ask whether an attorney's performance was deficient. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Hernandez v. State*, 988 S.W.2d 770, 774 (Tex. Crim. App. 1999). An attorney's performance is deficient if it falls below an objective standard of reasonableness. *Strickland*, 466 U.S. at 687; *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999). If the performance was deficient, we ask whether that deficiency prejudiced the defense. *Strickland*, 466 U.S. at 687; *Thompson*, 9 S.W.3d at 812. An attorney's deficient performance is prejudicial when, but for the attorney's unprofessional conduct, there is a reasonable probability that the outcome of the proceeding would have been different. *Strickland*, 466 U.S. at 694.

Shaw argues that his trial counsel's performance was deficient because he failed to make an offer of proof or otherwise ensure that the letters were included in the record and thus failed to preserve his right to appeal the trial court's *Brady* ruling. There is a strong presumption that an attorney's conduct—including a failure to take certain actions—was within the range of reasonable professional assistance and constitutes legitimate trial strategy. *See Mata v. State*, 226 S.W.3d 425, 430 (Tex. Crim. App. 2007). Shaw can only overcome this presumption if trial counsel's deficiency is affirmatively demonstrated in the appellate record. *Id.* Where, as here, the record is silent as to why trial counsel did not request that the letters be included in the appellate record, the presumption is not overcome. *Id.* at 431 (silent record does not overcome presumption that trial counsel's failure to object to inadmissible testimony was legitimate trial strategy); *Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994) (silent record does not overcome presumption that trial counsel's failure to challenge juror was legitimate trial strategy); *Johnson v. State*, 176 S.W.3d 74, 79

26

(Tex. App.—Houston [1st Dist.] 2004, no pet.) (silent record does not overcome presumption that trial counsel's failure to preserve error through offer of proof was legitimate trial strategy).

The presumption is bolstered in this case by the trial court's finding that the letters contained no mention of the defendant or the night in question. When faced with that finding, we cannot say that trial counsel's decision to not further pursue the letters fell below an objective standard of reasonableness. Furthermore, even if we were able to conclude that trial counsel's conduct was deficient, we could not, without reviewing the letters, evaluate whether the deficiency was prejudicial.[15] We overrule Shaw's fifth point of error.

## CONCLUSION

Because we find no reversible error, we affirm the trial court's judgment of conviction.

_____

Diane M. Henson, Justice

Before Chief Justice Jones, Justices Puryear and Henson

Affirmed

Filed: July 3, 2009

Do Not Publish

---

[15] The court of criminal appeals has noted the difficulty defendants face in overcoming the presumption of competent counsel and proving prejudice on direct appeal, especially in cases involving errors of omission rather than commission, and has therefore suggested that such claims are better pursued through a habeas corpus proceeding. *See Thompson v. State*, 9 S.W.3d 808, 814 (Tex. Crim. App. 1999); *Jackson v. State*, 973 S.W.2d 954, 957 (Tex. Crim. App. 1999).