TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-08-00506-CR






Eddie Ray Shaw, Appellant


v.


The State of Texas, Appellee






FROM THE DISTRICT COURT OF BASTROP COUNTY, 21ST JUDICIAL DISTRICT

NO. 12,621, HONORABLE REVA TOWSLEE CORBETT, JUDGE PRESIDING






M E M O R A N D U M O P I N I O N


 A jury found appellant Eddie Ray Shaw guilty of indecency with a child by
contact, see Tex. Penal Code Ann. § 21.11 (West 2003), and assessed punishment at eight years'
imprisonment and a $2,500 fine. The sentence and fine were suspended and Shaw was placed on
community supervision for eight years. In five points of error, Shaw argues that the evidence was
legally and factually insufficient to support the verdict, that the trial court abused its discretion in
admitting testimony regarding Shaw's unrecorded oral confession, that the trial court erred in not
including certain unadmitted evidence in the appellate record, and that trial counsel was ineffective
for failing to make an offer of proof regarding the unadmitted evidence. Having found no reversible
error, we affirm the judgment of conviction.






BACKGROUND

 Late in the evening on October 17, 2006, Shaw's sixteen-year-old step-daughter,
S.M., was in her bedroom in the mobile home she shared with her mother, her maternal aunt, her
cousin, and Shaw. While walking through the home, Shaw noticed the light on in S.M.'s room; he
peeked in through the door and observed S.M. taking pictures of herself in the mirror while wearing
only an unzipped hooded sweater and thong underwear. (1) Shaw then went into the room to speak to
S.M. What happened while he was in the room is largely disputed.

 According to S.M., she noticed a hand in the crack of the door and "I stood up
real fast because I was like, oh, my gosh, and [Shaw] walked in and asked me what I was doing." 
S.M. testified that she told Shaw she was taking pictures of herself because she was bored. Shaw
originally told S.M. he was going to go get her mother but S.M. testified that Shaw changed his mind
because "he decided he didn't want me to get in a lot of trouble." Then, Shaw came forward and
gave S.M. a hug. S.M. testified about the hug as follows:


A: He put his hands underneath my sweater and they went behind my back and
grabbed my butt.


Q: All right. Now what did you have underneath [the] hoodie?


A: Nothing.


Q: Did you have on panties?


A: Yes.


Q: Can you tell the jury what kind of panties you had on?


A: A thong.


Q: Okay, so, [S.M.], basically--and I'm sorry to ask you this, but the thong
really doesn't cover your behind, does it?


A: No.


Q: Okay. So again, he grabbed your butt, then what?


A: Then, whenever he was bringing his hands back up he came back up and
through--I don't know how to describe that.


Q: You're making a motion for the jury, so why don't you describe as best you
can--tell the jury as you're making the motion what you're trying to get them
[to] understand, as far as the touching?


A: He touched my breast like that.


Q: Okay. And again, that was inside the hoodie?


A: Yes.


Q: What was going through your mind at this time?


A: I was really scared.



On cross-examination, S.M. further described the way Shaw touched her, saying:


A: He had grabbed my butt and then whenever he was sticking his hand under
my sweater he went past [my] breast and went like--pushed them like that.


Q: The sides of your breast?


A: Yes.


Q: So he didn't grab or grope or squeeze or fondle or anything like that?


A: No.

According to S.M., Shaw then sat down in a chair and she sat on the bed and they talked for a
few minutes. S.M. testified that she was still in shock and scared and could not remember much of
the conversation, just that Shaw told her once again that "he didn't want to get my mom involved
because he didn't want to get me into too much trouble." S.M. further testified that, before Shaw
left the room, he reached across and tried to open up her sweater in order to see her bare breast again.

 Shaw's testimony at trial contradicted S.M.'s version of events. According to Shaw,
when he first saw S.M. in front of the mirror "with the phone up," he backed away from her door
and went into the kitchen. Shaw testified, "I sat there and thought about it for a minute and I thought
she had a camera in her phone, so that's when I walked back into her room and I opened the door
and I asked her what are you doing . . . ." S.M. then stood up and, according to Shaw, she covered
herself with her hooded sweater and held the sweater closed the entire time he was in the room. (2) 
Shaw testified that they talked for a few minutes and then:


 I was standing in the door and she came up and I reached over and I
kissed her on the cheek and I hugged her. My hand touched her
bottom and I moved it, when I did she grabbed it and then we stood
there and talked for a minute.



Shaw denied ever touching S.M.'s breast and claimed that he was not aware that she was wearing
thong type underwear until his hand touched her bare skin and that he immediately removed his
hand. Shaw testified that at some point after the hug S.M. asked if she could put on shorts. He
turned away while she did so and then the two sat down and continued their discussion for ten to
fifteen minutes before he returned to his bedroom. 

 After Shaw left the room, S.M. jumped out the window and went across the street to
the home of her neighbor, Keith. (3) According to Keith, S.M. walked up with a blanket wrapped
around her arm and:


I thought her arm got broke or cut off because she was just crying hysterically. I
was like, what's wrong? You know, what's the matter? She wouldn't say anything
and I just kept on asking what's wrong, what's wrong. I finally pulled her arm out
of the blanket to make sure that it wasn't broke because that's what it looked like,
and she said, I could have sworn, "Eddie, Eddie, he touched me again." If not, it
was something identical to that. And my exact response, I remember that with no
problem, it was like "Whoa, whoa, I do not want to hear this." That was getting into
something I don't think I could help her with.



Keith told S.M. that she needed to either get help from one of the other adults in her house or call
a friend to come pick her up.

 S.M. then called Della, the mother of a school friend. Della testified that when
S.M. called, "she sounded like she was crying, upset." S.M. told Della that Shaw had touched her
inappropriately and that she was afraid to go back home and asked Della to come pick her up. Della
brought S.M. to Della's house and called S.M.'s aunt, Sandy, to let her know where S.M. was
and that she was safe. Sandy spoke with S.M.'s mom, Debbie, who then drove over and spoke to
both Della and S.M. about what happened. S.M. spent the night at Della's house and returned
home the next day. A couple of weeks later, when Della learned that S.M.'s mom had not reported
the incident, Della sent an email to the child abuse hotline.

 After Della filed the complaint, Detective Joel Wade of the Bastrop County Sheriff's
Department was assigned to investigate the case. As part of his investigation, Wade interviewed
Shaw on more than one occasion. After the first interview, on November 6, 2006, Wade asked Shaw
to provide a written statement recounting the events of October 17. Shaw wrote:


On or about Oct. 17, 2006 I had got up to take my nightly stroll thru the house and
get a cigarette and had noticed [S.M.'s] light was on. Went and cracked the door
open and seen her standing in front of the mirror side ways taking pictures of herself
with nothing but her pant[ies] on. And now that I think about this she was posing
and it is not normal for this girl. So I went back to the kitchen and sat down and
thought about what [I] had seen so I got back up and went back to her room and ask
what are you doing and I hug her, my hands did touch her rear but not in any kind
[of] groping motion. [J]ust mainly trying to give her an opportunity to tell me what
she was doing taking pictures of herself and what she was doing with them. So after
I hug her she sat down on the bed and [I] sat in [the] chair in front of her and was
asking questions on things that had happened a few months prior to this time.
[Which] she still does not want to tell her part in all of that.


After our discussion I returned back to the kitchen and sat down still trying to
make some kind of [sense] in the behavior. While I was sitting[,] Sandy had received
a phone call that [S.M.] had jumped out the window [and] called Della.



 The next time Shaw came to the police station, on November 15, 2006, he first spoke
with Sergeant Donald Clendennen of the Department of Public Safety. The interview was not taped,
but Clendennen testified over defense objections about what Shaw said during the interview. 
Clendennen testified that Shaw initially denied touching S.M.'s breast, but, about an hour and a half
into the interview, he admitted that he did so. (4) According to Clendennen, Shaw said that when he
hugged S.M. he first grabbed her buttocks and then:


He said that his hands eventually--he slid[] his hand[s] up over her hips and her
waist and then they continued up inside the sweater until his hands came in contact
with her breast on the side and then he moved them around--this is him describing,
eventually--they were on the side, went underneath and then over the top. Both
hands on both breasts.


Clendennen also testified that Shaw said that he had touched S.M. because "he derived sexual
pleasure from it." Clendennen concluded the interview soon after obtaining Shaw's confession.

 Shaw then spoke with Detective Wade, who asked Shaw to write down what he had
told Clendennen. Shaw wrote:


I walked in [S.M.]'s room and asked her what she was doing taking pictures of
herself. I talked to her and ask for a hug when she turned and her sweatshirt flew
open I reached through and slid my hands by her breast[,] grab her but[t] and pulled
her close for a hug[,] kissed her on the cheek[,] and started talking to her.


I am very sorry for this and I will proseed [sic] in getting help and hopfully [sic]
understand why I did this.


I got up and walked in the living Rm. and noticed that [S.M.]'s light was still on at
1:20 a.m. When I cracked the door open and picked [sic] in I saw her standing side
ways with nothing but her pantys [sic] on and a phone taking pictures of herself.


This is the reason I went into her room.


 Prior to trial, Shaw made motions in limine to suppress his written and oral
statements. Wade and Clendennen were then questioned at trial outside the presence of the jury
regarding the circumstances of the statements. Wade testified that Shaw voluntarily came to the
police station on November 6 and, at the beginning of the interview, Shaw "was advised that he was
not under arrest . . . and that he was free to leave whenever he so desired" and was given Miranda
warnings. (5) In addition, the form on which Shaw wrote his statement detailed his rights, and Wade
testified that "I asked him if he would read through them and I asked him if he understood them
and he said that he did." Regarding the November 15 statements, Wade testified that Shaw once
again came to the station voluntarily. Wade greeted Shaw and informed him that he was not in
custody before escorting him to a back room in the police station where Shaw met with Clendennen. 
Clendennen testified that he told Shaw "several different times, several different ways" that Shaw
was free to terminate the interview and leave at any time. After the interview was over, Shaw met
with Wade, who reiterated to Shaw that his Miranda rights were still in effect before asking him to
write down what he had told Clendennen. Based on Wade's and Clendennen's testimony, the judge
overruled the defense objections and admitted all three statements.

 When Shaw testified later in the trial, he disputed Clendennen's description of his
oral statement and disavowed his second written statement. Shaw stated that, after two hours of
interrogation by Clendennen, "He had me so shook up, he could have said I did anything and I would
have said yes. I had just had enough, I wanted it done. I wanted out of there." According to Shaw,
"I told him whatever you say I did, I did. And that was my words to him. Whatever you say, I did it. 
I'm done, that's it. I had been tired of being drilled. And that was my exact words." Shaw
claims that, after he gave in, he was instructed to write another statement: "I was still a little shaken. 
I handed it to [Wade] and he was the one, you know, that at that time he was the one that told me
to write, you know, that you was sorry." Shaw maintained that his first written statement, from
November 6, was the accurate statement of his interaction with S.M. He testified that he never
actually touched S.M.'s breast, that she kept herself covered the entire time he was in the room, and
that he was not sexually aroused or gratified by the encounter.

 S.M.'s mother and aunt also testified at trial on Shaw's behalf. Both women testified
that Shaw often checked to make sure all of the lights are out at night. Debbie, S.M.'s mother,
further testified that if Shaw saw S.M.'s light on after her usual 10:00 p.m. bedtime, it would be
normal for him to check on her. Debbie said she had spoken with both Shaw and S.M. about what
happened in S.M.'s bedroom that night and that she believed what Shaw told her--that he gave S.M.
a kiss on the cheek, hugged her, and tugged on the lapel of her sweater--because, "I know Eddie and
he would not even entertain the thought of ever hurting my daughter, ever." S.M.'s aunt, Sandy, also
credited what Shaw told her, which was that "he gave her a hug and told her she shouldn't be doing
things like that and told her she had to go to bed." Shaw told Sandy that "when he was walking
out he popped her on the butt and said go to bed." Sandy also testified that S.M. and Shaw had a
"normal" father-daughter-type relationship before October 17, 2006, but that during the month after
the events in question, S.M. "was just quiet. She would go to her room and he would go to his." (6)

 During the trial, Shaw sought to discover letters to and from S.M. that were in the
possession of the prosecution, and which Shaw argued were potentially exculpatory Brady material. (7) 
The trial court conducted an in camera review of the letters and determined that they were not
relevant to the issues at trial and therefore were not discoverable or admissible.


DISCUSSION

 In five points of error, Shaw challenges the legal and factual sufficiency of the
evidence (points of error one and two), argues that the trial court erred in admitting Clendennen's
testimony regarding Shaw's unrecorded oral statement (point of error three) and in failing to include
the letters to and from S.M. in the appellate record (point of error four), and contends that his counsel
was ineffective for failing to make an offer of proof regarding the letters (point of error five). 
Because the question of whether Shaw's unrecorded oral statement was properly before the jury
impacts the evaluation of the factual and legal sufficiency of the evidence, we will address the issue
of its admissibility first.


Shaw's Unrecorded Oral Confession

 Shaw contends on appeal that the trial court erred by refusing to suppress his
oral statement to Clendennen because it was the product of custodial interrogation and was
not electronically recorded as required by article 38.22 of the code of criminal procedure. (8) See
Tex. Code Crim. Proc. Ann. art. 38.22, § 3 (West 2005). Under article 38.22, an oral statement made
by the accused during a custodial interrogation is inadmissible in a criminal proceeding against him
unless an electronic recording of the statement is made after the accused has been given and waived
Miranda warnings. (9) Id.; see Cedillos v. State, 250 S.W.3d 145, 151 (Tex. App.--Eastland 2008,
no pet.). However, article 38.22 does not apply if the accused is not in custody at the time he makes
the statement. Tex. Code Crim. Proc. Ann. art. 38.22, § 3; Herrera v. State, 241 S.W.3d 520, 525
(Tex. Crim. App. 2007). Therefore, the pertinent question is whether Shaw was "in custody" when
he made the statements to Clendennen.

 In determining whether an individual was in custody, courts examine the objective
circumstances surrounding the interrogation. Herrera, 241 S.W.3d at 525; Dowthitt v. State,
931 S.W.2d 244, 255 (Tex. Crim. App. 1996). A person is in custody only if, under the
circumstances, a reasonable person would believe that his freedom of movement was restrained
to the degree associated with a formal arrest. Herrera, 241 S.W.3d at 525; Dowthitt, 931 S.W.2d
at 254. The question of whether the accused was in custody thus presents a mixed question of
law and fact. Herrera, 241 S.W.3d at 526. We afford almost total deference to a trial judge's
custody determination when the questions of historical fact turn on credibility and demeanor. Id.;
Guzman v. State, 955 S.W.2d 85, 88-89 (Tex. Crim. App. 1999). We review de novo mixed
questions of law and fact that do not turn on credibility and demeanor. Guzman, 955 S.W.2d at 89.

 Shaw acknowledges that the interview began as a voluntary, non-custodial interview;
he came to the police station voluntarily, submitted to the polygraph examination voluntarily,
and was advised of his Miranda rights and told he could terminate the interview at any time. Shaw
argues, however, that once the polygraph was completed, "the tone, demeanor, and purpose of the
interview changed dramatically" and the interview became custodial. His argument is contradicted
by Clendennen, whose testimony was the only evidence before the trial court when it made the
custody determination.

 According to Clendennen, Shaw "was told he could terminate the interview at
any time; he was free to go at any time. He was told several different times, several different ways."
Clendennen testified that Shaw understood the warnings and signed forms indicating that
his presence at the interview was voluntary. The first hour and twenty minutes of the interview
was a polygraph examination, then Clendennen began a "sit-down" interview with Shaw. While
Clendennen acknowledged that, after the polygraph examination was completed, all of his questions
were aimed at gaining a confession, he also testified that the interview consisted mainly of "open-ended questions" and remained "completely voluntary" throughout the two hours.

 Shaw contends that continued questioning after a polygraph examination in an
attempt to garner a confession makes the interview custodial, citing to Bailey v. State, 281 S.W.3d
29 (Tex. App.--El Paso May 19, 2005, no pet.). However, "custody does not occur merely because
the suspect submits to and fails a polygraph test," Dowthitt, 931 S.W.2d at 255, nor does custody
occur merely because the interviewee is the focus of the investigation, see Cedillos, 250 S.W.3d
at 152. In Bailey, the defendant was in custody on a separate charge at the time of the interview, was
brought to the interview location by a police officer, and was returned to jail after the interview. 
Bailey, 281 S.W.3d at 34-35. In contrast, Shaw was not under arrest, came to the police station of
his own accord, was told he could leave at any time, and freely left the station after the interview. 
See Cagle v. State, 23 S.W.3d 590, 592 (Tex. App.--Fort Worth 2000, pet. ref'd) ("Here, Andrews
testified that she did not force appellant to come to her office, that the police did not pick him up,
that she did not place him under arrest, that he could leave the CPS office at any time, and that he
did in fact freely leave her office after the meeting. Under these uncontroverted circumstances, an
innocent, reasonable person would not feel restrained to the degree of a formal arrest."); see also
Bailey, 281 S.W.3d at 35 (distinguishing facts from those of Cagle). If Shaw was uncomfortable
with continuing the interview after the polygraph examination ended, he was free to leave the station
house or request to speak to an attorney. Clendennen testified that, had Shaw done so, he would
have immediately ended the interview and allowed Shaw to leave.

 The circumstances of the interview, as described by Clendennen, were not such
as would cause a reasonable person to believe he could not leave freely. See Herrera, 241 S.W.3d
at 525; Dowthitt, 931 S.W.2d at 254. Thus, Clendennen's testimony supports a finding that the
interview in its entirety was non-custodial and therefore supports the trial court's decision to admit
the statement.

 Later in the trial, Shaw testified regarding the circumstances of the interview
and painted an entirely different picture. (10) According to Shaw, Clendennen's questioning reminded
him of a drill sergeant and left him feeling "backed in a corner." Shaw testified, "[Clendennen] had
me so shook up, he could have said I did anything and I would have said yes. I had just had enough,
I wanted it done. I wanted out of there." Thus, according to Shaw, the only way he could end
the interview was to falsely confess. While Shaw's testimony could support an inference that the
interview became custodial, resolving the conflict between Shaw's and Clendennen's testimony
regarding the interview's atmosphere requires a credibility assessment. When making a suppression
determination, the trial court is the exclusive judge of the credibility of the witnesses and the weight
to be given their testimony. See Turner v. State, 252 S.W.3d 571, 576 (Tex. App.--Houston
[14th Dist.] 2008, pet. ref'd). The trial court was free to believe Clendennen's version of events and
did not abuse its discretion in doing so.

 Because the evidence before the trial court supports a finding that the interview
was non-custodial, the trial court did not abuse its discretion in admitting Shaw's oral statement. 
We overrule Shaw's third point of error.


Legal and Factual Sufficiency of the Evidence

 In his first and second points of error, Shaw argues that the evidence was legally and
factually insufficient to prove the charged offense of indecency with a child by contact.

 In reviewing the legal sufficiency of the evidence, we review all of the evidence in
the light most favorable to the verdict. Clayton v. State, 235 S.W.3d 772, 778 (Tex. Crim. App.
2007). The question presented is whether a rational trier of fact could have found the essential
elements of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 324 (1979);
Clayton, 235 S.W.3d at 778. We assume that the trier of fact resolved conflicts in the testimony,
weighed the evidence, and drew reasonable inferences in a manner that supports the verdict. 
Clayton, 235 S.W.3d at 778.

 In reviewing the factual sufficiency of the evidence, we consider all the evidence in
a neutral light, while giving due deference to the jury's determination. See Sims v. State, 99 S.W.3d
600, 601 (Tex. Crim. App. 2003); Vasquez v. State, 67 S.W.3d 229, 236 (Tex. Crim. App. 2002). 
This involves a two-part inquiry. See Johnson v. State, 23 S.W.3d 1, 6-7 (Tex. Crim. App. 2000). 
We first look at the evidence presented in support of the guilty verdict and reverse only if the
evidence "is so weak as to be clearly wrong and manifestly unjust." Id. at 11. If the evidence that
tends to prove the verdict is sufficient standing alone, we then compare it with the evidence the
defendant produces against the verdict, id. at 7, and reverse only if after the comparison the verdict
"is against the great weight and preponderance of the available evidence," id. at 11. The jury is the
sole judge of the credibility of the witnesses and the weight to be accorded their testimony. Vasquez,
67 S.W.3d at 236. We may not reweigh the evidence and substitute our judgment for that of the jury. 
Watson v. State, 204 S.W.3d 404, 417 (Tex. Crim. App. 2006); King v. State, 29 S.W.3d 556, 563
(Tex. Crim. App. 2000).

 To prove the offense of indecency with a child by contact, the State had to prove
(1) that S.M. was less than 17 years of age, and (2) that Shaw touched S.M.'s breast (3) with
the intent to arouse or gratify his sexual desires. See Tex. Penal Code Ann. § 21.11; Pizzo v. State,
235 S.W.3d 711, 715 (Tex. Crim. App. 2007); Perales v. State, 226 S.W.3d 532, 534-35
(Tex. App.--Houston [1st Dist.] 2006, pet. ref'd). Shaw argues that the State only proved incidental
contact with S.M.'s breast and therefore did not prove the third element--that he touched S.M. with
the intent to arouse or gratify his sexual desires. Shaw claims that the evidence shows instead that
he went into the room for a legitimate reason--to discuss his concerns about her taking pictures of
herself while scantily clad--that he hugged her in a "step-fatherly fashion," and that any contact with
her was incidental and not with sexual intent.

 There is rarely direct evidence of what an accused intended; therefore, the fact-finder
must usually infer intent from circumstantial evidence. See Hernandez v. State, 819 S.W.2d 806,
810 (Tex. Crim. App. 1991); Scott v. State, 202 S.W.3d 405, 408 (Tex. App.--Fort Worth 2006,
pet. ref'd). In the context of indecency with a child, the intent to arouse or gratify may be inferred
from the accused's conduct alone. Connell v. State, 233 S.W.3d 460, 467 (Tex. App.--Fort Worth
2007, no pet.); Scott, 202 S.W.3d at 408. Intent to arouse or gratify can also be inferred from
the defendant's behavior after the incident. See Perales, 226 S.W.3d at 535; Couchman v. State,
3 S.W.3d 155, 163 (Tex. App.--Fort Worth 1999, pet. ref'd). In this case, the jury could have
inferred that Shaw intentionally touched S.M.'s breast and that he did so with the intent to arouse
or gratify his sexual desires based on (1) S.M.'s testimony regarding Shaw's conduct, (2) Shaw's
oral and written statements from November 15, and (3) Shaw's actions after the incident.


S.M.'s Testimony

 S.M. testified that Shaw hugged her while she was clothed in only a thong and an
unzipped hooded sweater, "grabbed" her buttocks, and slid his hands inside her sweater, up her side,
and to her breasts. Shaw argues that, because S.M. testified that Shaw did not grope or fondle
her breasts, the conduct she testified to is not enough to support an inference of sexual intent. We
disagree. Shaw did not ask S.M. to get dressed so that he could speak with her, nor did he speak to
her mother about what he had seen. Instead, he chose to enter the room and request a hug from a
sixteen-year-old girl who was dressed only in an unzipped sweater and a thong. Furthermore, when
hugging her, he put his hands inside her sweater, "grabbed" her bare buttocks, slid his hands up the
sides of her bare torso, and "pushed her breasts to the side"--none of which is consistent with a
"step-fatherly" hug. Rather, such conduct is consistent with an intent to arouse or gratify his sexual
desires. (11) Shaw's sexual intent can also be inferred from the fact that he repeatedly told S.M. that
he was not going to tell her mother about her behavior. The jury could have concluded that Shaw
was warning S.M. that if she told her mother about their encounter, she would get in trouble.

 Shaw argues that S.M.'s version of events cannot be credited, because she accused
him of touching her breast in an effort to deflect attention away from what he deems her
"inappropriate" behavior before he entered the room. However, it is the jury's job to assess the
credibility of a witness. Vasquez, 67 S.W.3d at 236. The jury was free to believe S.M.'s testimony
about what transpired in her room that night and to draw reasonable inferences from that testimony. 
See Connell, 233 S.W.3d at 466 (complainant's testimony alone is sufficient to support conviction
for indecency with child).


Shaw's November 15 Statements

 Shaw's conduct as he himself described it in his November 15 oral and written
statements also supports an inference that he intentionally touched S.M.'s breast with the intent to
arouse or gratify his sexual desires. According to Clendennen, when asked why he touched S.M.'s
breast, Shaw told Clendennen "that he derived sexual pleasure from it." (12) This testimony alone is
enough to allow a reasonable jury to conclude beyond a reasonable doubt that Shaw touched S.M.
with the intent to arouse or gratify his sexual desires. In addition, the way that Shaw described his
actions to Clendennen--that he slid his hands up over her hips and waist and then to and around
S.M.'s breasts--also support an inference that his actions were aimed at arousing his sexual desires. 
Even the written statement, which contains a tamer account of Shaw's actions, supports an inference
of sexual intent. As discussed above, there is nothing "step-fatherly" about a hug in which Shaw
put his hands under S.M.'s sweater and slid them up to her breasts. While Shaw later disavowed
these statements, the jury, as the trier of fact, is the sole judge of the credibility of a witness and
may believe or disbelieve any part of a witness's testimony. Vasquez, 67 S.W.3d at 236; Johnson,
23 S.W.3d at 7. The jury was presented with Shaw's testimony regarding the pressure he felt
during the interview and his desire to say whatever was necessary to get out of the room. The jury
also heard Clendennen testify that the interview was "very casual [and] laid back" and that Shaw
never showed any hesitation about continuing the interview. The jury was then free to assess the
credibility of both witnesses and judge for itself who to believe. Based on the evidence presented,
the jury found Shaw's testimony at trial unpersuasive.


Shaw's Post-Incident Conduct

 Finally, Shaw's conduct following the incident--specifically his ever-changing
version of the events--supports an inference that he possessed the requisite intent. See Perales,
226 S.W.3d at 535 (defendant's initial denial of touching child followed by admission of touching
but with claim that it was for legitimate purposes supports inference of sexual intent); Couchman,
3 S.W.3d at 163 (same). While Shaw initially denied touching S.M.'s breast at all, he later admitted
doing so in both oral and written statements. While he later disavowed these statements at trial,
his version of what happened during the conversation with S.M. varied each time he told his story. 
At trial, he was inconsistent on whether S.M. was standing sideways--such that he could have
clearly seen that she was wearing only a thong--or sitting when he first observed her. He told Sandy
that he "popped" S.M. on the bottom, but neglected to mention this to Debbie. He told Debbie
that he "tugged" on the lapel of S.M.'s sweater, but did not mention this to Sandy or in any of his
statements to the police. Further, he did not mention the important details that S.M. held her sweater
closed the entire time he was in the room and put on shorts before he left the room until trial. 
Shaw's inconsistent stories support an inference that he was trying to conceal his actions and
his sexual intent.

 Viewing all of the evidence--S.M.'s testimony regarding Shaw's actions, Shaw's
oral and written statements from November 15 regarding his actions and intent, and his conduct after
the incident--in the light most favorable to the verdict, we conclude that a reasonable jury could
have concluded beyond a reasonable doubt that Shaw touched S.M.'s breast with the intent of
arousing or gratifying his sexual desires. Therefore, the evidence is legally sufficient.

 Viewing this same evidence in a neutral light, we conclude that the evidence
supporting the jury's verdict is not so weak as to render the verdict clearly wrong and manifestly
unjust. Shaw's testimony at trial that he hugged S.M. but did not see or touch her bare breasts
is not so persuasive as to render the guilty verdict against the great weight and preponderance
of the evidence. Therefore, the evidence is factually sufficient. We overrule Shaw's first and
second points of error.


S.M.'s Letters

 At trial, Shaw sought to discover certain letters to and from S.M. that were in
the possession of the prosecution. While a defendant does not have a general right to discovery
of evidence in the possession of the State, see Michaelwicz v. State, 186 S.W.3d 601, 612
(Tex. App.--Austin 2006, pet. ref'd), he does have a right to evidence that is favorable to him
and material to his guilt or punishment, see Brady v. Maryland, 373 U.S. 83 (1963); Ex parte Adams,
768 S.W.2d 281, 293 (Tex. Crim. App. 1989); Tex. Code Crim. Proc. Ann. art. 39.14 (West Supp.
2008) (describing when State's evidence is discoverable by defense). When the prosecution has
refused to turn over certain evidence, the defendant has a due process right to have the trial court
examine the requested evidence in camera and then order the disclosure of any discoverable
evidence. (13) See Thomas v. State, 837 S.W.2d 399, 407 (Tex. Crim. App. 1992); Michaelwicz,
186 S.W.3d at 614. Here, the trial court conducted an in camera review of the letters and ruled that
the evidence was not discoverable, saying, "There is absolutely nothing contained within any of
those documents that have anything to do with this case, therefore I'm ruling that they are not
admissible. . . .  [T]hey are not discoverable because they are not Brady and I do believe they have
absolutely no value whatsoever to this case."

 In his fourth point of error, Shaw argues that the trial court erred in not including
the letters in the appellate record so we could review the lower court's Brady determination. Shaw
requests that we abate the case and order the trial court to supplement the record with: 


copies of the evidence reviewed by the court along with any necessary testimony
and/or findings of fact regarding such evidence, including, but not limited to,
evidence regarding the source of the excluded evidence, how the excluded evidence
came to be in [the] possession of the State, who provided the excluded evidence to
the State, and the specific reasoning of the trial court as to why the excluded evidence
did not amount to Brady or otherwise discoverable material.


Based on the record before us, we hold that the trial court did not err and that the matter does not
need to be abated because (1) the information regarding the source of the evidence and how it came
to be in the possession of the State is evident from the record, (2) the trial court already provided
detailed findings of fact regarding why the letters were not Brady material, and (3) Shaw did not
request that the letters be sealed and included in the appellate record for our review.

 The record before us contains the facts regarding the letters that Shaw requests
and indicates that his trial counsel knew how and from whom the State obtained the evidence before
he requested the in camera review. The first mention of the letters came when defense counsel
questioned Detective Wade outside the presence of the jury:


Q: I think sometime later on in the next week or so, I think November 17th,
Debbie [] came to your office with a letter or with a document she had; is that
correct?


A: She had some notes, yeah.


Q: And what did those notes contain?


A: Just teenage talk between two girls in school, or whatever.


Q: They are between her and who else?


A: I'm not sure who they're all from, some are signed, some aren't.


. . .


Q: Do you have possession of those letters or were they turned over to the DA's
office?


A: I do not have them in my possession right now.


Q: Do they have them--were they turned over to the DA's office?


A: Yes, I believe they were, possibly. I don't remember for sure.


This line of questioning makes it clear that the State obtained the letters on or near November 17,
2006, when S.M.'s mom, Debbie, gave the letters to Wade.

 Shaw's trial counsel also asked Wade about the content of the letters and he replied
that they were "basically one girl writing another girl about what they thought about sex, or, you
know, dreams." Wade further testified that the letters did not mention the night in question, saying:
"There was no mention in any of those letters, whatsoever, about that particular incidence [sic] with
the phone. There was nothing in the letters, in any of the letters, that said that on this night I was
doing this with my phone." Based on this description, the trial court indicated that the letters were
likely irrelevant to the issues at trial--and thus neither discoverable nor admissible--but agreed to
conduct an in camera review of the letters before making a final ruling.

 After reviewing the letters, the trial court ruled that they were neither discoverable
nor admissible because they were not relevant to the issues at trial. See Tex. Code Crim. Proc. Ann.
art. 39.14 (authorizing discovery of material evidence within possession of State); Tex. R. Evid. 402
("Evidence which is not relevant is not admissible."). Defense counsel, noting the difficulty he faced
in persuasively arguing for discovery without knowing the content of the letters, requested that the
trial court make findings of fact regarding the letters. The following exchange then took place:



The Court: Well, those will be my findings of fact, that they are letters
written amongst teenagers, there is no date and time on any of
them for me to determine when they were written. The majority
of the letters were not even written by the witness, they are
written by other parties. I can make a more detailed record if
you want later on but that's all I'm going to give you right now.


Defense Counsel: I guess as far as detail, the subject matter of the letters and
whether or [not] they were--uh--


The Court: The subject matter seems to be teenagers discussing life
situations, and some of them do, as I believe you asked one of
the officers, relate[] dream sequences but not real life. The
majority of them have--they have no mention, and I'll say it
again, absolutely no mention of this defendant, no mention of
this case and absolutely nothing to do with this case.


Defense Counsel: And no mention of anything that transpired on the date of this
case?


The Court: Nothing whatsoever. Nothing to do with this case, nothing
about this defendant, nothing about what happened to him, not
a thing at all.


Defense Counsel: Ok, thank you, Your Honor, we may at some point ask for
findings of facts.


The Court: I can give you findings of facts but I don't know how to be any
more detailed than what I've just given you.

The trial court's responses constitute oral findings of fact and clearly explain that the letters are not
discoverable because they are not even relevant to the issues at trial, much less exculpatory and
material to the defendant's guilt. (14)

 After the trial court ruled that the letters were neither discoverable nor admissible
and made its findings of fact, Shaw did not request that the letters be sealed and placed in
the appellate record for our review. Thus, the trial court did not err by not including the letters
sua sponte. Rather, Shaw waived any right to challenge the trial court's ruling that the evidence was
undiscoverable and inadmissible when he failed to request that the material be included in the record. 
See Guidry v. State, 9 S.W.3d 133, 153 (Tex. Crim. App. 1999) (error regarding exclusion of
evidence is not preserved unless record indicates what excluded evidence would have been);
Villareal v. State, 576 S.W.2d 51, 65 (Tex. Crim. App. 1978) (accused waived possible Brady error
by failing to secure inclusion of prosecutor's file in record).

 For the foregoing reasons, we hold that the trial court did not err in failing to include
the letters in the appellate record. We overrule Shaw's fourth point of error.


Ineffective Assistance of Counsel

 In his fifth point of error, Shaw contends that his trial counsel was ineffective for
failing to make an offer of proof regarding the letters or otherwise ensure that they would be included
in the appellate record for our review.

 In reviewing a claim of ineffective assistance of counsel, we first ask whether
an attorney's performance was deficient. Strickland v. Washington, 466 U.S. 668, 687 (1984);
Hernandez v. State, 988 S.W.2d 770, 774 (Tex. Crim. App. 1999). An attorney's performance
is deficient if it falls below an objective standard of reasonableness. Strickland, 466 U.S. at 687;
Thompson v. State, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999). If the performance was deficient,
we ask whether that deficiency prejudiced the defense. Strickland, 466 U.S. at 687; Thompson,
9 S.W.3d at 812. An attorney's deficient performance is prejudicial when, but for the attorney's
unprofessional conduct, there is a reasonable probability that the outcome of the proceeding would
have been different. Strickland, 466 U.S. at 694.

 Shaw argues that his trial counsel's performance was deficient because he failed to
make an offer of proof or otherwise ensure that the letters were included in the record and thus failed
to preserve his right to appeal the trial court's Brady ruling. There is a strong presumption that an
attorney's conduct--including a failure to take certain actions--was within the range of reasonable
professional assistance and constitutes legitimate trial strategy. See Mata v. State, 226 S.W.3d 425,
430 (Tex. Crim. App. 2007). Shaw can only overcome this presumption if trial counsel's deficiency
is affirmatively demonstrated in the appellate record. Id. Where, as here, the record is silent as to
why trial counsel did not request that the letters be included in the appellate record, the presumption
is not overcome. Id. at 431 (silent record does not overcome presumption that trial counsel's failure
to object to inadmissible testimony was legitimate trial strategy); Jackson v. State, 877 S.W.2d
768, 771 (Tex. Crim. App. 1994) (silent record does not overcome presumption that trial counsel's
failure to challenge juror was legitimate trial strategy); Johnson v. State, 176 S.W.3d 74, 79
(Tex. App.--Houston [1st Dist.] 2004, no pet.) (silent record does not overcome presumption that
trial counsel's failure to preserve error through offer of proof was legitimate trial strategy).

 The presumption is bolstered in this case by the trial court's finding that the letters
contained no mention of the defendant or the night in question. When faced with that finding, we
cannot say that trial counsel's decision to not further pursue the letters fell below an objective
standard of reasonableness. Furthermore, even if we were able to conclude that trial counsel's
conduct was deficient, we could not, without reviewing the letters, evaluate whether the deficiency
was prejudicial. (15) We overrule Shaw's fifth point of error.


CONCLUSION

 Because we find no reversible error, we affirm the trial court's judgment
of conviction.


__________________________________________

 Diane M. Henson, Justice

Before Chief Justice Jones, Justices Puryear and Henson

Affirmed

Filed: July 3, 2009

Do Not Publish
1. S.M. testified at trial that the sweater could not be zipped up because the zipper
was broken.
2. Shaw's testimony varied as to whether S.M. was standing or sitting in front of the mirror 
when he first saw her. At first, he testified that she was standing. But, he later said she "stood up"
and testified that she had been sitting and so he knew she was wearing a sweater but did not know
what else she was wearing until she stood up. He then testified again that he observed her standing
sideways in front of the mirror.
3. In order to help protect S.M.'s identity, we will refer to adult friends and family, other than
the defendant, by their first name only.
4. The initial part of the interview was a polygraph examination of Shaw, which lasted
approximately an hour and twenty minutes. After completing the test, Clendennen continued to
question Shaw, and Shaw's responses to these later statements were the subject of Clendennen's
testimony before the jury.
5. Miranda v. Arizona, 384 U.S. 436 (1996).
6. S.M. continued to live with her mother for a month after the events in question. After that,
she lived with her adult brother for a month before moving in with her father.
7. Brady v. Maryland, 373 U.S. 83 (1963).
8. On appeal, Shaw does not assert any error based on the trial court's admission of his two
written statements.
9. Article 38.22 of the code of criminal procedure provides that:


(a) No oral or sign language statement of an accused made as a result of custodial
interrogation shall be admissible against the accused in a criminal proceeding unless:


 (1) an electronic recording, which may include motion
picture, video tape, or other visual recording is made of the
statement;

 

 (2) prior to the statement but during the recording the accused
is given the warning in Subsection (a) of Section 2 above and
the accused knowingly, intelligently, and voluntarily waives
any rights set out in the warning;

 

 (3) the recording device was capable of making an accurate
recording, the operator was competent, and the recording is
accurate and has not been altered;

 

 (4) all voices on the recording are identified; and

 

 (5) not later than the 20th day before the date of the
proceeding, the attorney representing the defendant is
provided with a true, complete, and accurate copy of all
recordings of the defendant made under this article.


Tex. Code Crim. Proc. Ann. art. 38.22, § 3(a) (West 2005).
10. Generally, we would look only to the evidence that was before the trial judge at the time
he made his suppression ruling. However, when the alleged error is the admission of evidence at
trial and the issue was consensually litigated there, the evidence is considered to have been re-opened. Barley v. State, 906 S.W.2d 27, 31 n.2 (Tex. Crim. App. 1995).
11. We also note that Keith's and Della's description of S.M.'s demeanor after the incident
is consistent with S.M.'s version of events rather than with Shaw having simply given her a "step-fatherly" hug. Keith testified that S.M. was "crying hysterically" and "Della testified that when she
spoke to S.M. on the phone, S.M. "sounded like she was crying and upset" and that when she went
to pick S.M. up, S.M. "acted like she was kind of scared, she was upset, teary eyed."
12. At trial, Clendennen was asked whether Shaw used that exact phrase--"sexual
pleasure"--to describe his intent and Clendennen responded that he was "absolutely" positive that
Shaw used that phrase.
13. To be entitled to in camera review, the defendant must first show there is a "probable" or
"reasonable" probability that the evidence at issue contains Brady material. See Michaelwicz
v. State, 186 S.W.3d 601, 614 (Tex. App.--Austin 2006, pet. ref'd).
14. Furthermore, based on what we do know about the content of the letters--from Wade's
testimony and the trial court's findings of fact--we are confident that the trial court did not err in
its rulings. Both Wade and the trial court noted that the letters contained no mention of the night in
question. The trial court further found that the letters contained no mention of the defendant. Thus,
the letters were not relevant to the key question at trial--whether Shaw touched S.M.'s breast with
sexual intent on October 17, 2006.


 At trial and on appeal, Shaw indicates that the letters might contain evidence to support a
theory that S.M. was using her phone to send pictures of herself and/or engaging in "phone sex" and
thus bolster his testimony that he went into S.M.'s room because he was concerned about her
behavior. However, Shaw's reason for entering S.M.'s room that night is only tangentially related
to the real issue at trial, which was his conduct after he entered her room. Our conclusion is
bolstered by analogy to Texas's rape shield law, which protects victims of sexual assault from just
such an airing of their past sexual behavior. See Tex. R. Evid. 412.
15. The court of criminal appeals has noted the difficulty defendants face in overcoming
the presumption of competent counsel and proving prejudice on direct appeal, especially in cases
involving errors of omission rather than commission, and has therefore suggested that such claims
are better pursued through a habeas corpus proceeding. See Thompson v. State, 9 S.W.3d 808, 814
(Tex. Crim. App. 1999); Jackson v. State, 973 S.W.2d 954, 957 (Tex. Crim. App. 1999).